**John B. BRANHAM, Plaintiff-Appellant,**

v.

**John W. GARDNER, Secretary of Health, Education and Welfare, Defendant-Appellee.**

**No. 16911.**

United States Court of Appeals
Sixth Circuit.

Sept. 8, 1967.

Ronald W. May, Pikeville, Ky., for appellant.

Moss Noble, Asst. U. S. Atty., Lexington, Ky., George I. Cline, U. S. Atty., Lexington, Ky., on brief, for appellee.

Before McCREE, Circuit Judge, PORTER,* District Judge, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

This appeal is from denial of an application for disability benefits under the Social Security Act. The Hearing Examiner's decision was approved by the Appeals Council, and thereafter the District Court dismissed the claim.

Appellant is a man past sixty years of age. He "got nowhere in school," never learned to read or write, and became a manual laborer when he was twelve years old, helping his father cut mine timbers. He continued at this work until he was fourteen, when he got a job working on a coke oven as a dauber, and continued this job for two years until he was sixteen years old, when he started work as an underground coal miner. He then worked for thirty-six years as a hand loader in the coal mines. In August 1959, he became so ill while at work as a coal miner that he had to quit the job.

First of all, in order to understand what this controversy is about, it will

---

* Honorable David S. Porter, United States District Judge for the Southern District of Ohio, Western Division, sitting by designation.

clarify the case to state that appellant's claim is that he is disabled as a result of psychoneurosis, anxiety reaction, coupled with accompanying cardiac and arteriosclerotic impairments.

Psychoneurosis is a term used in psychiatry. While those who believe in a so-called "no-nonsense" approach to mental illness say that, in common parlance, everyone is neurotic, there are none skilled in the science of psychiatry or medicine who would disagree with regard to the meaning of psychoneurosis, as that term is used by physicians and psychiatrists.

It might be well here to recall that in the case of Pollard v. United States, 282 F.2d 450 (C.A.6), this court had occasion to recognize the debt which society owes to psychiatry, when we said, with respect to the controlling issue therein considered:

"Psychiatry is a great and important science upon which the legislative and judicial branches rely. Federal statutes provide for psychiatric examinations of persons accused of crime, as well as those deemed to be suffering from mental illness or insanity. Courts consider evidence from psychiatric experts in arriving at a determination whether an accused is not guilty of crime by reason of insanity."

In the above cited criminal case, this court held that the undisputed evidence of psychiatric experts that the defendant therein was not responsible for his actions because of psychoneurosis, dissociation reaction, could not be disregarded by the court, but must be accepted as against the "common sense" view of the trial judge that defendant was so responsible.

We are speaking, then, in this case of psychoneurosis and anxiety reactions, not as lawyers or laymen but, necessarily, according to the evidence presented, of those terms, as used by experts—psychiatrists and physicians—who have embodied them in their psychiatric and medical reports which were considered in the evidence on the hearing of this case.

As this court said in Miracle v. Celebrezze, 351 F.2d 361, 376:

"Studies in psychosomatic medicine, as hereafter appears, disclose that emotions can cause transitory or chronic disturbances of physiological functions, and this fact is sustained by the courts. In this case, Dr. Beeman, after examining appellant, recommended that he should have the benefit of consultation with a neurologist and, perhaps, a psychiatrist because of the degree of anxiety present. Dr. Baird stated that appellant was extremely psychosomatic. Other physicians gave it as their opinion that there was a large psychosomatic element affecting appellant's condition. In 'Mental Abnormality and Crime' published as one of the English Studies in Criminal Science, by the Department of Criminal Science, Faculty of Law, University of Cambridge (MacMillan and Co., Ltd., London, 1944), Dr. D. R. MacCalman, M.D., Lecturer in Psychopathology at Aberdeen University, at p. 129, states:

"'We must first distinguish from the normal anxiety which the average workman feels after injury and an anxiety neurosis proper. Anxiety of the normal type is bound to occur in a disabled workman, for his most precious possession, his health, has been threatened, perhaps permanently, and this constitutes, to himself and his family, a threat which is very real. The reduction in pay from his normal wage to thirty shillings weekly, which is the maximum disablement allowance made under the Act, means using up his savings or semi-starvation for his household. Even this meagre allowance may be further reduced when he is certified fit for "light work". He tries to get work, but who will employ him in his disabled or semi-disabled condition? He becomes tense, irritable, sleepless, or, if he loses hope, listless, soured and indifferent. Such a state

is unfortunately only too common; it is painful and serious, but it is not an anxiety neurosis. It is caused by an obvious and very real environmental threat to security; it would never occur if injured workmen were relieved of material anxiety, if they got proper rehabilitation treatment and were assured of employment in the future.

" 'Now, because this normal type of anxiety can be relieved by suitable work and economic security, a regrettable fallacy has crept into the attitude of doctors and lawyers toward neurosis cases. They see that the patient suffers from anxiety, mistake it for normal worry over his position, and think that he will be cured by work. This not only implies that a neurosis is something akin to laziness, or at least faint reluctance "to do an honest day's work", but confuses the condition with a consciously determined attitude of mind. Even patients themselves have been fooled into believing that work would cure them. *Nothing is further from the truth. A neurosis can be cured only by psychotherapy * * *.' "*

Further, in Miracle v. Celebrezze, supra, p. 376, quoting an authority in psychiatry, it was said:

" 'Arthritis, for example, may be the reaction to a simple, emotional disturbance. It may mark a deeply buried emotional disturbance. It may have created such tissue damage that it is called organic. In all three cases the joints may be equally swollen, the pain equally intense.' "

It used to be that, unless impairment or disabilities could be substantiated by objective symptoms, they were not considered, as, in any way, established. "But modern medicine is neither so scientific nor so helpless today that it either does, or must, evaluate only objective factors." Hayes v. Celebrezze, 311 F.2d 648, 654 (C.A.5).

In Walker v. Gardner, reported July 3, 1967, in 266 F.Supp. 998, 1002 (D.C. Ind.), it was stated:

"It is well established that disability as defined in the Social Security Act may be a result of physical or mental impairments, or a combination of both. '(T)here is no need to consider mental and physical condition separately. We have come too far in our knowledge of the relationship of mind and body totally to truncate one from the other in our considerations. Just as all physical and all mental impairments must be taken into account in determining the extent of disability, so may physical and mental impairments in their totality result in a finding of disability.' Farley v. Celebrezze, 3 Cir., 1963, 315 F.2d 704. And purely subjective symptoms may sustain a finding of disability. Page v. Celebrezze, 5 Cir., 1963, 311 F.2d 757. For a detailed discussion of the disabling effects of anxiety neurosis, see Miracle v. Celebrezze, 6 Cir., 1965, 351 F.2d 361, beginning at page 375."

Psychoneurosis, with anxiety reaction, is the most important element in this case.

The diagnostic terms employed by psychiatrists and in the records of mental hospitals are abbreviations for sets of symptoms which are relatively standardized in medical literature and increasingly relied upon in practice. That laymen are less familiar with the content of these terms than with the terminology of older branches of medicine, should not cause us to close our eyes to useful evidence. We have gone far since the days when mental injury was considered too speculative to be compensable. Where we are dealing with regularly recorded psychiatric diagnoses, which would be acceptable in testimonial form, there is no reason to condemn them as more conjectural than ordinary medical diagnoses, or as less likely than ordinary medical diagnoses to be agreed upon by equally competent men. Lyles v. United States, 103 U.S. App.D.C. 22, 254 F.2d 725, 740. In the instant case, psychoneurosis is a disorder

recognized in the Regulations governing disability benefits under the Social Security Act, 20 C.F.R. Sec. 404.1519.

Psychoneurosis, as defined in "A Psychiatric Glossary" approved by the American Psychiatric Association,[1] consists of: "Emotional maladaptations due to unresolved unconscious conflicts. One of the two major categories of emotional illness, the other being the psychoses. A neurosis is usually less severe than a psychosis, with minimal loss of contact with reality. Thinking and judgment may be impaired. A neurotic illness represents the attempted resolution of unconscious emotional conflicts in a manner that handicaps the effectiveness of a person in living. Types of neuroses are usually classified according to the particular symptoms which predominate. Common types are:

> "anxiety reaction: Characterized primarily by direct experiencing of anxiety, which may have an acute or gradual onset, with subjective uneasiness or apprehension out of proportion to any apparent external cause. The anxiety is uncontrollable * * *."

We have seen from the foregoing some of the manifestations of neurosis or psychoneurosis with anxiety reaction. Psychoneurosis, with conversion reaction, testified to by one of the physicians employed by the Government as being the condition in which he found appellant, is more serious, being "a reaction in which unacceptable unconscious impulses are converted into bodily symptoms. Instead of being experienced consciously, the emotional conflict is expressed by physical symptoms."[2] There are also a number of other serious reactions in psychoneurosis, among them being depressive reactions, dissociative reactions, obsessive compulsive reactions, and pho-

bic reactions.[2] Enough has been said to show that the field is one in which the layman or nonprofessional student is completely unlearned and is to be guided by the expert in psychiatry and medicine, and not by notions picked up in newspaper or magazine reading or by so-called "no nonsense" or "common sense" views of this profound scientific subject.

Among the evidential exhibits which the Examiner had before him on the hearing were seven medical reports submitted by Dr. Francis H. Hodges, of Pikeville, Kentucky. Six of these reports were filed by Dr. Hodges, while appellant was seeing Dr. Hodges as a patient; and the last report filed by the physician was one prepared by Dr. Hodges as a result of a consultative examination requested by the Secretary.

Dr. Hodges' earliest report was a form medical report, dated October 12, 1959, covering treatment from September 9, 1959, to October 10, 1959, in which Dr. Hodges diagnosed appellant's condition as essential vascular hypertension with anxiety present. Anxiety, as the term is used in medicine and psychiatry, does not correspond to worry as that word is generally used. "Anxiety" is defined in "A Psychiatric Glossary" as:

> "Apprehension, tension, or uneasiness which stems from the anticipation of danger, the source of which is largely unknown or unrecognized. Primarily of intrapsychic origin, *in distinction to fear*, which is the emotional response to a *consciously* recognized and usually external threat or danger. Anxiety and fear are accompanied by similar physiologic changes. May be regarded as pathologic when present to such extent as to interfere with effectiveness in living, achievement of de-

---

1. "A Psychiatric Glossary" (Second Edition, 1964 Fifth Printing, 1966 Washington, D. C.) is the official manual, defining words and concepts in psychiatry, published by the American Psychiatric Association. Several hundred thousand copies have been sold, and it is available from the Association at a small cost,

being used not only by psychiatrists, but, to a considerable extent, by general physicians, lawyers, medical students, therapists, school teachers, and others interested in the subject. It is commonly accepted as the standard handbook on the subject it embraces.

2. See "A Psychiatric Glossary," p. 63.

sired goals or satisfactions, or reasonable emotional comfort."

We proceed, then, to the further reports of Dr. Hodges. In his second report, which was before the Hearing Examiner, Dr. Hodges reported electrocardiogram findings suggestive of early left bundle branch block. No neurological findings were noted, except *anxiety overlay.* In Dr. Hodges' opinion, appellant's condition was static, and he would not improve. This report was supplemented by a letter, wherein Dr. Hodges stated that, at that time, there was no evidence of coronary insufficiency; but shortness of breath was noted, occurring with marked activity; but it was difficult to evaluate as to whether it was caused by an actual coronary problem *or anxiety.*

In a further report filed by Dr. Hodges, covering treatment from September 9, 1959, to February 1, 1960, he reported that an electrocardiogram showed left ventricular enlargement, which was verified by X ray. Diagnoses were:

Essential vascular hypertension, grade I,

Cardiac enlargement, and hypertensive cardiovascular heart disease, grade II.

Dr. Hodges stated that appellant was unable to do physical labor; that *anxiety was present;* that his condition was basically unchanged; that he was illiterate and uneducated; could do no work except physical work, and was now disabled for that.

Two later reports from Dr. Hodges covering treatment through September 27, 1960, set forth a diagnosis of essential vascular hypertension, grade I, "slightly enlarged to percussion," *with anxiety present.* On December 11, 1960, Dr. Hodges reported a further diagnosis of coronary arteriosclerosis; that the heart was not then enlarged; that appellant suffered from dyspnea on walking one block, and angina, on activity.

On April 17, 1961, appellant, at the request of appellee Secretary, was reexamined by Dr. Hodges, who made a rather full report in which he told of appellant's statement of becoming suddenly blind for a time when he stooped over while working in a coal mine, and that he had attacks of severe sweating; that when he came to his physician, it was felt that he had an *anxiety reaction* as a part of his illness. Dr. Hodges went on to state that appellant, according to his complaints, had marked weakness in his legs, as well as a burning sensation on the lateral surfaces of both, near the ankle; that he had a marked leg ache, and suffered loss of sleep because of this symptom; and that fatigue was present when he had the aching. The heart action seemed to Dr. Hodges to be normal; but an X ray of the chest showed the heart shadow to be slightly displaced to the left, but, at that time, there was no enlargement. The left costophrenic angle was obliterated and the diaphragm was flat. The right one was round, smooth and normal in appearance. Minor periobronchial beading was noted, as well as some minor increase in fibrosis; otherwise the chest was within normal limits. In this report, Dr. Hodges, after noting his objective findings, expressed an opinion that they were not significant enough to indicate a disability from appellant's heart condition, *but that appellant did have a marked and deep psychoneurosis.*

In addition to the medical evidence of Dr. Hodges, Dr. W. C. Hambley of Pikeville, Kentucky, submitted several medical reports. In an undated prescription slip report (afterward substantiated by dated reports), Dr. Hambley stated that appellant had coronary artery disease, and that he had recovered very well from heart failure. However, he noted that appellant had no pulmonary reserve, and was unable to earn a living by manual labor; and it was Dr. Hambley's opinion that appellant was totally disabled for manual labor. In a subsequent report, dated June 12, 1963, Dr. Hambley reported that appellant had shortness of breath, chest pain, and dyspnea, on the slightest exertion; that an X ray of his chest showed pulmonary fibrosis, left ventricular hypertrophy; that an electrocardiogram showed left heart strain and

hypertrophy, and that he had hypertension. Dr. Hambley's diagnosis was that appellant had coronary sclerosis with angina pectoris, pulmonary fibrosis, hypertension, and left ventricular hypertrophy and left heart strain. Furthermore, Dr. Hambley stated that appellant's condition was progressive, and that "This man is totally and permanently disabled for manual labor due to heart disease." One year later, on June 29, 1964, Dr. Hambley made another examination of appellant, took an X ray and electrocardiogram, and made a report identical to the foregoing, stating again that appellant was totally and permanently disabled for manual labor due to heart disease.

Three other medical reports were submitted by another physician, Dr. W. E. Clarke, of Pikeville, Kentucky. In the first report, dated June 10, 1963, Dr. Clarke reported that he had first examined appellant on May 1, 1963, and had been treating him for about six weeks up to the date of the report. Dr. Clarke reported diagnoses of angina pectoris, and psychoneurosis with anxiety reaction; and he gave it as his opinion that appellant was permanently and totally disabled for all manual labor. More than a year after filing this report, on June 22, 1964, Dr. Clarke sent a letter addressed to the Social Security Administration in Pikeville, Kentucky, reporting that appellant had been in to see him regularly, and that his condition remained unimproved. He further stated that appellant had been on full medication but still continued in his state of disability. Dr. Clarke noted that, at that time, the electrocardiogram was normal, but that the chest X ray showed a second stage pneumoconiosis. Four years before the last report of Dr. Clarke, above mentioned, in a report from the hospital of the Miners Memorial Hospital Association, on September 7, 1960, Dr. B. J. Hohmann, after a physical examination, reported his impression that appellant had chronic, congestive heart failure, and advised a clinic appointment for a complete evaluation as soon as possible. Two

weeks thereafter, on September 22, 1960, from the same hospital, Dr. James D. Evans reported that there were no signs at that time of laboratory findings of heart, renal, or pulmonary disease, except X ray, "showing old appearing reaction left base, laterally with slightly elevated diaphragm and shift of mediastum, same side * * * heart—completely normal to re-examination. Fundi—early grade II changes." Appellant was advised by Dr. Evans to return to Dr. Hodges for continuation of his management and "to take note requesting review of old films re possible recent occurrence, left pleural process, necessitating more investigation." It will be recalled that after the above report from Dr. Evans, appellant was examined three different times by Dr. Hodges and treated by him for several months during which Dr. Hodges reported at that time, appellant's heart was not enlarged, but that he was suffering from arteriosclerosis, coronary disease, and angina pectoris; that appellant had a marked and deep psychoneurosis, and, although his heart and lungs were not a part of this particular problem, appellant was completely disabled because of such psychoneurosis.

Dr. Donald I. George, a psychiatrist, of Psychiatric Associates, of Lexington, Kentucky, on April 17, 1961, after a discussion with appellant, who reported for a psychiatric examination at the request of the Social Security Administration, stated:

"Examination shows Mr. Branham to be a neat, clean, young-looking man who was cooperative but superficial and guarded in giving information. He is definitely introspective, somatically preoccupied, complaining, and has vague suspicions that information is being withheld regarding his physical condition. He is suggestible, particularly when discussing his physical complaints but one could not get him to talk about his past adjustment, particularly regarding his marital conflicts nor his feelings about life in general. One gathers that he painted a picture that he feels will be to his

advantage rather than being completely straightforward. He lacks motivation and drive and sees himself as an inadequate person in his frequent references to his lack of education. There is no evidence of any psychotic thinking. He definitely wants to find a physical justification for his disability."

Dr. George then diagnosed appellant's illness as "Psychoneurosis, conversion reaction." He added: "Prognosis: Guarded."

Counsel for the Secretary seems to confuse "diagnosis" and "prognosis." Diagnosis, of course, means the act of recognizing the presence of disease, from its signs or symptoms, and deciding as to its character, or the decision arrived at from such symptoms. Prognosis is the act or art of foretelling the course and termination of a disease.

A year after Dr. George's diagnosis, on August 23, 1962, Dr. Don V. Hatton of Williamson, West Virginia, at the request of the Social Security Administration, examined appellant, filed a report, and, after commenting on his physical condition, gave a diagnosis that appellant was suffering from psychoneurosis.

Three years after Dr. George's diagnosis, Dr. Dale H. Farabee, a psychiatrist of the Lexington Medical Health Center, was directed by the Social Security Administration to make a further psychiatric examination of appellant, and on January 16, 1964, after a considerable examination and conversation with the appellant, reported, among other matters, the following:

"The patient stated he had worked steadily in the mines for some thirty-six years, but had never worked in a big mine nor was he covered in any way by welfare or pension. He last worked steadily in 1959. The patient was able to describe clearly, coherently and relevantly the situation in which he was working. He stated that he was laying track, but that when he was young he could have laid enough track for three times the mine area they were working. At the time, however, he was unable to keep pace with the men working the face, and he was constantly needing help from them or from loaders to get his track laid. He stated that he used to have to pull sections of track which might weigh as much as six hundred pounds into position with a rope in order that the coal cars could be moved forward as the face advanced. He stated that he became very short of breath and weak and was unable to work fast enough or well enough to keep up. When asked if he had quit before he was fired, he became indignant, but this seems to be part of the problem. Undoubtedly, the man was in serious trouble with holding up his end of the work, and his physical ability at the age of 52 or 53 to do this kind of labor was sure to be noticed by the management. He stated that he had help from his boss and that he simply couldn't 'pull the load.' He was so completely uneducated as to be unable to hold down any other type of job except physical labor, and he felt that his physical strength was rapidly being depleted. * * *

"There was no indication of paranoid feeling, but there was considerable affect with regard to his personal image. Any attempt at discussing his concept of himself brought forth an immediate return to the psychophysiological and physiological complaints. I feel this represents a rather strong neurotic unconscious defense against the depression which rides close behind the breakdown of physical ability in these men who have based their entire concept of themselves upon their muscular prowess. * * *

"However, it was suggested to him that it might be possible for him to be a butcher or a barber. He stated he felt that barbering would be impossible as he would have to be able to read and write, but that he would certainly take any job he could if he could handle it physically. Such employment is absolutely unavailable in

the area in which this man lives, and I feel that any attempt to formally educate him will be a formidable undertaking. In general, I think this man represents a psychoneurotic problem in that his ego defenses have seized upon every physical ailment he has as a method of justifying to his own feelings and to the appearances for others that he has not been able to maintain a physical pace. This man has two very small children, which worries him a great deal. In the cultural and economic background he is now facing, I feel he is severely impaired with regard to pre-illness vocational and social adjustments. Diagnostic Impression: Anxiety Reaction manifested by psychophysiological complaints. If he should receive benefits, I feel he would be able to manage them in his own interests at this time."

With regard to Dr. Farabee's diagnosis that appellant represented a psychoneurotic problem, with anxiety reaction manifested by psychophysiological complaints, it should be mentioned that psychophysiological disorder refers "to serious disturbances of any organ system caused by prolonged, unresolved emotional conflict." [3]

The last medical evidence was that of Dr. Conrad E. Herr, of the Memorial Medical Center of Williamson, West Virginia, who was employed by the Social Security Administration to make an examination of appellant on March 20, 1964, and who, apparently, saw appellant only on that one occasion. Dr. Herr reported that the "Social history is known to the Rehabilitation Office." He also stated that appellant told him that he could no longer work because he has "weakened down" because whenever he would stoop over, he would see stars, because the "sweat would want to boil off" everytime he tried to work, and because he had lost his wind; that these difficulties came on gradually; that he could walk on level ground "a right smart little piece," but that he could not walk up-

grade. Dr. Herr reported that he had no paroxysmal nocturnal dyspnea, orthopnea, pedal edema, or cardiac chest pain. He further reported: "I must note here that the history cannot be considered valid." Whether the physician meant the "social history" which was "known to the Rehabilitation Office," is not clear. He may have meant the sweating, stooping-over symptoms, losing his wind, and inability to walk up a grade that appellant told him about. Whatever the facts of such history, it is unimportant in the light of Dr. Herr's final conclusion, which we will hereafter relate. Prior thereto, Dr. Herr stated: "There were no spontaneous statements. The patient would only answer the most direct questions and then he would give evasive, guarded answers." We are not told what the questions were or what the answers were, except perhaps a question with an answer to the following effect: "He does state that he has intercourse only once a month because the effort is so tiring." This might seem a "guarded" answer that many patients would give to such a question. Dr. George had already reported that one could not get appellant to talk about his past adjustment, particularly his marital conflicts; that he was cooperative, but superficial and guarded in giving information, definitely introspective, and somatically preoccupied. Dr. Farabee had reported he was very emotional about his personal image, and that any attempt at discussing his concept of himself brought forth an immediate return to the psychophysiological complaints, and the physician thought that this represents a strong neurotic, unconscious defense which rides close behind the breakdown of physical ability of men who have based their entire concept of themselves upon their muscular prowess. Dr. Farabee's evidence is, therefore, in complete consonance with Dr. George's view, earlier expressed, that appellant "definitely wants to find a physical justification for his disability"; and both of these psychiatrists gave the Social Security Administration their

3. See "A Psychiatric Glossary," p. 64.

diagnoses that appellant was suffering from psychoneurosis. ·

Dr. Herr also stated of appellant: "He has never used tobacco to any extent. He uses no alcohol." The report went on to state that the physical examination revealed nothing abnormal. However, the important part of this report, in the light of the medical evidence of all the other physicians, was that: "The neurologic examination is physiologic." Neurology is the branch of medical science devoted to the study, diagnosis and treatment of organic diseases of the nervous system. Dr. Herr continued: "Mechanics of breathing revealed slight obstructive ventilatory dysfunction and slightly impaired dynamic function. * * * The left costophrenic angle is obliterated from old pleural thickening. The heart is retracted slightly to the left, very likely as the result of a process that caused the left base pleural thickenings." The impression of Dr. Herr was that appellant had:

"1. Exogenous obesity.
2. Psychophysiologic respiratory reaction.
3. Slight obstructive ventilatory dysfunction due to pulmonary emphysema."

A psychophysiologic disorder, as above referred to, refers to serious disturbances of any organ system caused by prolonged, unresolved emotional conflict.[3]

The uncontradicted medical evidence shows that appellant suffers marked and deep psychoneurosis. This was the final and concluding opinion of Dr. Hodges, who was appellant's attending physician for several years, and who filed seven medical reports, which were before the Examiner on the hearing, the last report of Dr. Hodges being a consultative examination which was prepared as the result of a request of the Secretary and carrying Dr. Hodges' conclusion that appellant was completely disabled for physical work.

Dr. Clarke, as above mentioned, after examining and treating appellant for a considerable time, on June 10, 1963, reported his diagnosis that appellant was suffering from psychoneurosis with anxiety reaction, and from angina pectoris; and that he was permanently and totally disabled for all manual labor. More than a year after the foregoing report, Dr. Clarke again reported to the Social Security Administration that appellant had been seeing him regularly, and that his condition remained unimproved, although he had been treated with "full medication."

Dr. George, a psychiatrist employed by the Government, diagnosed appellant's illness as "psychoneurosis, conversion reaction." Conversion reaction differs from anxiety reaction, which was diagnosed by the other physicians and psychiatrists, in that a conversion reaction is one "in which unacceptable unconscious impulses are converted into bodily symptoms. Instead of being experienced consciously, the emotional conflict is expressed by physical symptoms." [2]

Thus, as the court said in Lightcap v. Celebrezze, D.C., 214 F.Supp. 209, 215, 216, in discussing pain and bodily symptoms caused by emotional conflicts:

"Is there any indication of what causes the plaintiff's pain? Is the pain organically caused or emotionally caused, or is it an admixture of both? * * * It is the expression of experts that emotional pain can be as disabling as organic pain, when the one who suffers it feels it as if it were real pain. In such a case, disability would result and could disable such a person from substantial gainful employment within the meaning of the Social Security Act.

"In this day of scientific and medical achievement, there are numerous medical experts in the field who may examine and test a complaining person objectively and determine with reasonable accuracy the reality and genuineness of a person's subjective complaints, and as well, if any pain exists, its character and extent. Al-

---

2. See "A Psychiatric Glossary," p. 63.

3. See "A Psychiatric Glossary," p. 64.

though as between organic and emotional pain, certain instances may not be tested to determine which may be causing the pain, nevertheless, the pain in both may be as real and as disabling."

Dr. Hatton of Williamson, West Virginia, who was employed by the Government to examine appellant, also made a diagnosis, as stated, that appellant was suffering from psychoneurosis. As previously mentioned, Dr. Farabee, the psychiatrist employed by the Government, made a very complete examination and rendered a report in which he diagnosed appellant's illness as psychoneurosis with anxiety reaction manifested by psychophysiological complaints. This is exactly the condition described by the court in Lightcap v. Celebrezze, supra, in which the disability arose out of emotional pain, and the applicant was held to be as much disabled by emotional pain as by organic pain.

It was this condition that was described in Miracle v. Celebrezze, 351 F.2d 361 (C.A.6), in which it appeared that "sustained emotional strain may lead to chronic disturbances of physiological functions and in this way cause bodily diseases." Dr. Herr's diagnosis that appellant was suffering from a psychophysiologic respiratory reaction was a clear conclusion that appellant was suffering from psychoneurosis.

Appellant's claim to disability benefits was supported by substantial evidence. All of the psychiatrists whose evidence was before the Hearing Examiner stated that appellant was suffering from psychoneurosis, and all of the physicians who had occasion to consider this disability, from their repeated treatments and examinations of appellant, likewise gave it as their opinion that appellant was suffering from psychoneurosis.

Dr. Hodges, whose last examination of appellant was on April 17, 1961—after he had made six prior examinations—diagnosed appellant as having a marked

and deep psychoneurosis. After Dr. Hodges' reports, Dr. Clarke, among other serious afflictions of appellant, also stated that he had psychoneurosis with anxiety reaction and was totally disabled. Dr. George, a psychiatrist employed by the Social Security Administration, made an examination and reported appellant had "psychoneurosis, anxiety reaction." Dr. Hatton, a physician employed by the Social Security Administration, after an examination of appellant, gave a diagnosis that he was suffering from psychoneurosis. Dr. Farabee, a psychiatrist employed by the Government, after an extensive examination, reported that appellant represented a psychoneurotic problem with anxiety reaction, manifested by psychophysiological complaints—that is, serious disturbances of an organ system caused by prolonged, unresolved emotional conflict. Dr. Herr, a physician employed by the Government, reported that the neurologic examination was physiologic and that appellant had psychophysiologic respiratory reaction.

Thus, every physician [4] and psychiatrist, commencing with Dr. Hodges, who examined appellant either at his own request, or at the request of the Government—five physicians and two psychiatrists—diagnosed appellant as suffering from psychoneurosis.

As to the psychoneurotic disorders of appellant herein discussed, and in evidence, the only variation between the findings in the medical or psychiatric evidence in this case goes to the degree of seriousness of the psychoneurotic disorders from which appellant suffers, and not to the existence or nonexistence of these disorders.

As said in Underwood v. Ribicoff, 298 F.2d 850, 852 (C.A.4):

"The results of an examination of Claimant conducted at Government request by Doctors Reeves and Levy on May 5, 1959, far from negating Dr.

---

4. Dr. Hambley, one of appellant's physicians, examined him as to heart and lung conditions, but not as to psychoneurotic disorders.

Howard's findings, add additional weight to them. * * *

"Thus the only variation between the findings of Reeves and Howard goes to the degree of seriousness of three of several adverse physical conditions, and not to the existence or non-existence of these conditions. Howard found *severe* emphysema while Reeves said it was only *mild*. Both found generalized arteriosclerosis, but Reeves said it was only mild to moderate. Howard found a possible aortic aneurism. Reeves did not find that such condition *did not exist*, but rather omitted to make any mention of it. *Consideration here should be given to the fact that Howard was Claimant's treating physician, whereas Reeves saw him only once for a routine examination.*" (Emphasis supplied.)

In the instant case, it cannot even be said that the variation between the findings in the medical or psychiatric evidence goes to the degree of seriousness of the psychoneurotic disorders from which appellant suffers.

In Page v. Celebrezze, 311 F.2d 757, 761 (C.A.5), the court observed:

"Two doctors categorically expressed positive opinions of inability to work, and the consultant's report, viewed most unfavorably to Claimant, stated nothing more than the absence of objective evidence to support complaints of pain in areas other than the hands."

And in the *Page* case, the court stated the facts that are before us in the instant case:

"On the record before the Examiner, not a single witness, lay or medical, undertook even faintly to suggest that Claimant was able to do anything."

Not only did all of the medical and psychiatric experts, both for appellant and for the Secretary, state that appellant was suffering from psychoneurosis, but medical evidence that he was completely and permanently disabled for manual labor was undisputed. Specifically, the medical evidence of Dr. Hodges,

Dr. Hambley, and Dr. Clarke, all of whom had examined and treated appellant over a considerable period of time, was that he was completely and permanently disabled. None of the other medical evidence of Dr. Farabee, Dr. George, Dr. Herr, and Dr. Hatton, all of whom were employed by the Social Security Administration, disputed these findings of Dr. Hodges, Dr. Hambley, and Dr. Clarke. In fact, the evidence of the psychiatrists and physicians employed by the Social Security Administration strongly tended to support those findings of disability by their diagnoses that appellant was suffering from psychoneurosis, anxiety reaction, and conversion reaction.

■ There is no substantial evidence —or any evidence—to support the decision of the Hearing Examiner that appellant does not have any physical or mental impairment that would prevent him from returning to his work as a hand loader of coal in the mines.

■ On this appeal, we are confronted with several grave errors of law which form the basis of the Hearing Examiner's decision, and which constitute reversible error. The rule governing these cases has been clearly set forth in Ferran v. Flemming, 293 F.2d 568, 571 (C.A.5), where the court stated:

"Our review is ordinarily, of course, limited to determining merely whether there is substantial evidence to support the administrative findings. But here, just as in the 'clearly erroneous' review of a judge's findings, *when the fact-finder has failed to employ the proper legal standard in making its determination the finding may not stand.* Mitchell v. Mitchell Truck Lines, 5 Cir., 1961, 286 F.2d 721; Henderson and Poole v. Flemming, 5 Cir., 1960, 283 F.2d 882; United States v. Williamson, 5 Cir., 1958, 255 F.2d 512; Mitchell v. Raines, 5 Cir., 1956, 238 F.2d 186. *The facts must be evaluated by the administrator in the light of correct legal standards to entitle the administrative findings to the insula-*

*tion of the substantial evidence test."* (Emphasis supplied.)

If the Hearing Examiner, therefore, has been in error in evaluating the facts by correct legal standards, there is no substantial evidence to support his findings.

The Hearing Examiner held:

"The Act requires that the impairment be 'medically determinable'; that is, the existence of an impairment must be established by objective medical, clinical, or laboratory evidence."

■ The foregoing holding constituted prejudicial and reversible error.

In Polly v. Gardner, 364 F.2d 969 (C.A.6), this court had occasion to pass upon this particular issue and to hold that the decision of the Hearing Examiner that medical evidence must be supported by objective clinical findings and reports was error, requiring reversal of the judgment of the District Court, which sustained the holding of the Secretary to this effect. In the *Polly* case, this court said:

"As we have heretofore observed in Ross v. Gardner, 365 F.2d 554, 558, 559 (C.A.6) (decided July 29, 1966):

" 'Obviously, the Hearing Examiner in this case, as in other cases coming to our attention, assumed that "medically determinable" means "supported by objective clinical findings and reports." *The Act means nothing of the kind.*

" 'Mental impairment alone may result in disability entitling the one suffering therefrom to disability benefits under the Social Security Act. Such impairment may be medically determinable but, in few cases, could a conclusion of such impairment be supported by objective clinical findings. See Hill v. Celebrezze, 233 F.Supp. 298 (D.C. E.D.S.C.)

" 'Pain, unaccompanied by any objectively observable symptoms, may be so real and so intense as to be dis-abling, and will support a claim for disability benefits. Ber v. Celebrezze, 332 F.2d 293 (C.A.2). The fact that there is such a subjective symptom as pain of claimant for social security benefits does not mean that it ranks as a lesser type of disability. Blanscet v. Ribicoff, 201 F.Supp. 257 (D.C.Ark.).

" *'There is no requirement that a physician's evidence or testimony must be supported by objective clinical findings.* Page v. Celebrezze, 311 F.2d 757 (C.A.5); Lightcap v. Celebrezze, 214 F.Supp. 209 (D.C.Pa.).

" 'It was error on the part of the Hearing Examiner to hold, in this case, that the physician's opinions or conclusions must be supported by adequate objective clinical findings.' " (Emphasis supplied.)

The Hearing Examiner further held:

"The evidence does not support a conclusion that the claimant as a result of his neurosis has suffered social, personal, or occupational regression of the severity contemplated by the Regulation."

The Regulation, which the Hearing Examiner mentions in the foregoing holding, is as follows:

"In determining the effect of psychoneurosis, consideration is given to whether the psychoneurosis has resulted in severe social, personal and occupational regression or confinement to a mental hospital and whether it persists despite appropriate treatment. * * * *"

■ This Regulation does not state the requirements that must be met if a finding of psychoneurosis entailing inability to work is to be made, but is only advisory or suggestive to the effect that, in appraising a psychoneurotic disorder, *consideration is given to certain factors* —not that they are in any way conclusive, or that, without such symptoms, no finding of psychoneurosis can be made.

The main conclusion of the Hearing Examiner is set forth in his decision as follows:

"Furthermore, in the considered opinion of the Hearing Examiner, to approach and meet the level of severity contemplated by the Act for the type of disorder found in neurosis, there must be findings of unacceptable social behavior, severe persistent depression, gross errors in judgment and reasoning, insomnia, inability to concentrate, marked loss of weight with malnutrition, or other severe somatic manifestation of a deep seated intractable psychogenic disorder. In the present instance the Hearing Examiner believes that such findings are not present and those that are present do not exist in the degree of severity contemplated by the Act as stated previously."

The foregoing is a completely erroneous statement of what the Act contemplates, since there is no indication in the language of the statute that such findings are necessary.

As an instance that there is no requirement that there must be present the illnesses and disorders above enumerated by the Hearing Examiner in order to meet the level of severity contemplated by the Act for the type of disorder found in neurosis, the court, in Ber v. Celebrezze, 332 F.2d 293, 300 (C.A.2), in reversing the Secretary and directing payment of disability benefits to a claimant suffering from psychoneurosis, said:

"Thus, whatever the value to be placed on the Hearing Examiner's statement that 'inasmuch as the claimant has never been treated psychiatrically it cannot be said that whatever psychoneurosis she may have is intractable to therapy,' that statement cannot be taken as a finding of a failure to meet the statutory test of an illness of long-continued and indefinite duration which has substantial evidentiary support. A mere failure to supplement the above evidence of an illness of indefinite duration with a report by an examining psychiatrist

that, whatever the effect of a neurosis on the claimant's condition, *that neurosis is intractable to therapy, cannot bar the grant of disability benefits to this claimant.* At the very least, 'the applicant has raised a serious question and the evidence affords no sufficient basis for the Secretary's negative answer.'" (Emphasis supplied.)

The Hearing Examiner quotes from the Social Security Regulations, 20 C.F.R. 404.1510(a) to the effect that allegations of inability to work as a result of various impairments, such as pain, should be shown to result from structural, physiological or psychological changes, which can be identified by the use of clinical and laboratory diagnostic techniques, and that "An alleged impairment is medically determinable only if it can be verified by the use of clinical and laboratory diagnostic techniques." But to hold that, in order to be medically determinable, psychoneurosis must be verified by a laboratory diagnostic technique would be contrary to the Act. "Determination of a claimant's disability may depend on more than clinical findings." Walker v. Gardner, D.C., 266 F.Supp. 998, 1002. The Hearing Examiner must consider evidence of claimant's subjective symptoms; and all factors, including objective medical facts and expert medical opinion must be viewed against the appellant's age, educational background, and work experience. Mode v. Celebrezze, 359 F.2d 135 (C.A.4); Ber v. Celebrezze, 332 F.2d 293 (C.A.2). "The Act does not require that there be clinical findings or proof to support a physician's evidence or testimony. Ross v. Gardner, 365 F.2d 554 (C.A.6)," Walston v. Gardner, 381 F.2d 580 (C.A.6), (decided Aug. 7, 1967).

In Homm v. Gardner, D.C., 267 F. Supp. 926, decided May 8, 1967, the court said:

"In both the recent cases of Pollard [Pollard v. Gardner, D.C., 267 F.Supp. 890, decided April 17, 1967], and Underwood [Underwood v. Gardner, D.C., 267 F.Supp. 802, decided May 4, 1967], this Court applied the teaching of

Marion v. Gardner (8th Cir. 1966), 359 F.2d 175. That case establishes that if the Secretary's regulation is more restrictive than the standards provided by the federal statute, the regulation is void. Pollard considered Section 404.1513 of the Regulations; both *Marion* and *Underwood* considered Section 404.1519(c) (2) (iii). This case considers Section 404.1510. * * * [W]e simply hold that the manner in which that section of the Regulations was read and applied in this case was inconsistent with the federal statute and that the hearing examiner, in effect, read restrictions into the statute that were not provided by the Congress."

██ Page v. Celebrezze, 311 F.2d 757 (C.A.5), is important in its rejection of the idea expressed in Section 404.1510 of the Regulations that pain must be demonstrated by objective clinical and laboratory findings. In that regard specific attention was properly directed to the language of the statute. The addition of a more restrictive standard by administrative action was firmly rejected. We agree with Judge Brown when he stated that:

"If pain is real to the patient and as such results in that person being physically unable to engage in any gainful occupations suited to his training and experience, and this results from 'any medically determinable physical or mental impairment' the disability entitles the person to the statutory benefits *even though the cause of such pain cannot be demonstrated by 'objective clinical and laboratory findings.'* " 311 F.2d at 762–763. (Emphasis supplied.)

In Homm v. Gardner, supra, the court said:

"This case is not unlike Celebrezze v. Warren (10th Cir. 1964) 339 F.2d 833, in which the district court's reversal of the Secretary's denial of disability was affirmed.

"That case involved migraine headaches—a condition that obviously must, in most cases, be diagnosed from subjective symptoms alone. Indeed, the Secretary in that case conceded that if 'Warren's subjective allegations as to his headaches were accepted at face value a finding of disability would be warranted' (339 F.2d at 837). The Secretary, however, denied disability because 'there was no proof of organic cause' and because 'the intensity of pain cannot be measured by objective standards' (339 F.2d at 836). Judge Pickett properly determined that 'a defect does not cease to exist merely because it is difficult of proof'. He also held that 'the disability contemplated by the Act is not restricted to that which is subject of proof by laboratory findings.' "

In Underwood v. Gardner, D.C., 267 F.Supp. 802, decided May 4, 1967, the court said:

"The prime difficulty with the decisions of both hearing examiners is that they sought to place labels on plaintiff's mental condition as directed by administrative regulations instead of making the findings of fact contemplated by the Congress. * * *

"[I]n Marion v. Gardner [8 Cir., 359 F.2d 175, 179, 180, Judge Blackmun, speaking for the court said]:

"This court in recent opinions has held that an applicant has the burden of establishing his claim; that the Social Security Act is remedial and is to be construed liberally; that the Secretary's fact findings and the reasonable inferences to be drawn from them are conclusive if they are supported by substantial evidence, 42 U.S.C. Sec. 405(g); that substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; that the determination of the presence of substantial evidence is to be made on a case to case basis and on the record as a whole; that where the evidence is in conflict or subject to conflicting

inferences it is for the Appeals Council, on behalf of the Secretary, to resolve those conflicts; that the statutory definition of disability imposes the threefold requirement (a) that there be a medically determinable physical or mental impairment of the type specified by the statute, (b) that there be an inability to engage in any substantial gainful activity, and (c) that the inability be by reason of the impairment; that substantial gainful activity is that which is both substantial and gainful and within the claimant's capability, realistically judged by his education, training and experience; and that the emphasis is on the particular claimant's capabilities and on what is reasonably possible, not on what is conceivable or theoretical. Celebrezze v. Bolas, 316 F.2d 498, 500–501 (8 Cir. 1963); Celebrezze v. Sutton, 338 F.2d 417, 418 (8 Cir. 1964); Brasher v. Celebrezze, 340 F.2d 413, 414 (8 Cir. 1965). [359 F.2d 179–180].

"Marion v. Gardner specifically teaches that we must 'look * * * at the specific language of the federal statute' not to the language of the regulations. And the district courts must see what the Court of Appeals saw when it looks at the federal statute."

The court, in *Underwood*, also said:

"We further find and determine that the only conflict in the evidence related to what label should be placed on plaintiff's obvious mental impairment and that the restrictive language of the regulation was applied to deny liability in a case in which the undisputed evidence established liability under the federal statute."

In Walker v. Gardner, D.C., 266 F. Supp. 998, 1002, 1003, it was held:

"*The expert opinions of plaintiff's treating physicians as to plaintiff's disability and inability to engage in any substantial gainful employment are binding upon the referee if not controverted by substantial evidence to the contrary.* Teeter v. Flemming, 7 Cir., 1959, 270 F.2d 871, 77 A.L.R.2d 636. Kerner v. Flemming, 2 Cir., 1960, 283 F.2d 916. Testimony of lay witnesses is also entitled to consideration. Underwood v. Ribicoff, 4 Cir., 1952, 298 F.2d 850.

"The evidence of the defendant's medical experts controverts the diagnosis of Parkinson's disease. One states that plaintiff suffers from a conversion reaction, manifested by tremor, weakness, and slow sensory responses. Another states that he has both a conversion reaction and a depressive reaction. The third feels that he may be in need of shock therapy. What is significant about this testimony is not what it controverts, but what it does not controvert. In short, the medical experts disagree as to the exact cause of plaintiff's condition, but defendant's experts do not dispute the existence of the condition, nor that it is disabling. They merely ascribe the condition to a mental, rather than a physical ailment. They do not offer a scintilla of testimony that plaintiff is able to perform any substantial, gainful employment. * * *

"The ultimate question in cases of this kind is not as to the exact causation of a disabling impairment. The ultimate questions are (1) does plaintiff have a medically determinable physical *or mental* impairment, etc., and (2) if so, does it render him unable to engage in any substantial gainful activity? For example, take the case of the individual who suffers from sheer physical weakness which makes it impossible to work; one doctor says he has a chronic coronary insufficiency, while another thinks his problem is emphysema. What difference? The Act concerns itself with results, not exact causes.

"So in this case, all doctors agree that plaintiff has a severe tremor and bodily weakness. Some doctors say that the condition is totally disabling, *and none says that it is not.* Whether

deriving from physical reasons, or because of a profound psychoneurosis, or both, no physician suggests that plaintiff's condition does not render him functionally unable to work. It has persisted for many years, and shows no signs of going away. The Hearing Examiner, however, gives no weight to the testimony of plaintiff's physicians, relying on certain administrative regulations. In this he is in error. Hall v. Celebrezze, 6 Cir., 1963, 314 F.2d 686. * * *

"It appearing that the findings and conclusions of the Secretary are not supported by substantial evidence, they are contrary to law. The defendant's motion for summary judgment is therefore denied." (Emphasis supplied.)

Moreover, a laboratory diagnostic technique could not show emotional pain, which, as appears in many cases, heretofore discussed, has, in itself, been held by the courts to be disabling, entitling the claimant to disability benefits; nor could a laboratory diagnostic technique reveal that a person was a sexual deviate who could pursue work only under close and continuous supervision, and who was therefore disabled under the Social Security Act, and thus entitled to disability benefits. Marion v. Gardner, 359 F.2d 178 (C.A.8).

It was not necessary, in order to establish that appellant's impairment was "medically determinable," that it be verified by a laboratory diagnostic technique.

In Bradley v. Gardner, D.C., 260 F. Supp. 796, 798, 799, the court held that it was not necessary for an applicant to produce objective medical evidence or show by the use of clinical and laboratory diagnostic techniques that he suffered from an impairment which was medically determinable. In holding that the Secretary's decision in a disability case was not supported by substantial evidence, the court said:

"In Beggs v. Celebrezze, 356 F.2d 234 (4th Cir. 1966), the hearing examiner in that case had stated:

" 'The anxiety reaction is mainly a response to a deplorable economic situation * * * [t]here is no evidence of hallucinations or delusions or disabling mental disease, and the claimant is oriented as to time and place. *The slowing down in his mental processes, and his depression, are not abnormal reaction to five years of unemployment and public assistance.* This has had a destructive effect upon the claimant's life and personality. There is no doubt that this man has many psychiatric complaints * * *.' "

The Fourth Circuit, in commenting upon those findings *and upholding the anxiety reaction as a determinable impairment,* stated:

" '*The entire record shows a steady and increasing deterioration in the petitioner's mental condition which had already produced totally disabling symptoms by September of 1959, one year after loss of employment.* We cannot understand the significance of the examiner's finding that the mental condition was a result and not a cause of petitioner's unemployment. This was obviously true, but the mental condition was nonetheless disabling within the statute.'

"Aside from a passing reference to the physician who reported plaintiff's nervousness in 1942 the hearing examiner found nothing significant in regard to the plaintiff's mental condition for he makes no other reference to it. The record is plain and uncontradicted that the *plaintiff suffers from a 'chronic anxiety reaction',* in combination with his other impairments. Likewise, as in Beggs, *it is insignificant that his mental condition is the result of unemployment,* poor vision, or other stress." (Emphasis supplied.)

In accordance with the foregoing, the court held that the decision that the appellant was not entitled to disability benefits was not supported by substantial evidence.

The Secretary relies upon the statement of the psychiatrist employed by the Government, Dr. George, whose recommendation read:

"The picture is not too clear regarding this man's physical condition and certainly it is my feeling that he should have a definitive medical work-up and if nothing of significance is found, tell him so very definitely and recommend that he return to employment. Otherwise, this man promises to become more and more of an invalid."

However, just before this recommendation, Dr. George diagnosed appellant as having "psychoneurosis, conversion reaction." As heretofore stated, a "conversion reaction" is one in which "unacceptable unconscious impulses are converted into bodily symptoms."

The fact that Dr. George expressed the view that appellant should have a definite medical work-up, and, if nothing was found, appellant should be told so, very definitely, and that it should be then recommended to him to return to employment, in no way means that Dr. George found that appellant was not disabled for manual labor, since he adds to his recommendation: "Otherwise, this man promises to become *more and more of an invalid.*" (Emphasis supplied.)

■ Since appellant, according to Dr. George's own diagnosis, suffered from psychoneurosis, conversion reaction, his advice that a recommendation that appellant return to employment must have been considered by him to be of no more than therapeutic value, since the only cure for psychoneurosis is psychotherapy. The fact that Dr. George added to his statement that if appellant did not follow the recommendation "to return to employment," he would become more and more of an invalid, shows the views of Dr. George as to appellant's condition and implies the probability of appellant becoming *more* of an invalid as a result of the psychoneurosis from which he was admittedly suffering and from which he had been suffering for several years. With regard to Dr. George's advice in

his report that a recommendation be made to appellant to return to employment, in the light of appellant's psychoneurosis, and invalidism, this certainly was considered by the physician solely as a therapeutic measure. In Whittier v. Gardner, D.C., 263 F.Supp. 670, footnote 10, p. 676, it was said: "the record does not show whether he advised plaintiff to attempt work for therapeutic reasons or because he felt plaintiff was able to do so. In any event [the physician] would stand alone in the opinion that plaintiff was capable of working. * * * the entire record, including all the other medical evidence, compels a contrary conclusion."

As one of his principal findings, the Hearing Examiner set forth:

"The Hearing Examiner is of the opinion that the claimant is not motivated to work."

Apparently, the Hearing Examiner relied, in this regard, upon the statement of Dr. George, who said of appellant: "He lacks motivation and drive and sees himself as an inadequate person in his frequent references to his lack of education." This appraisal fits in with Dr. Farabee's view that appellant *"represents a psychoneurotic problem* in that his ego defenses have seized upon every physical ailment he has, as a method of justifying to his own feelings, and to the appearances of others, that he has not been able to maintain a physical pace," and that *"he is severely impaired* with regard to pre-illness vocational and social adjustments." (Emphasis supplied.)

Both Dr. George and Dr. Farabee, it will be remembered, were the two psychiatrists employed by the Social Security Administration who diagnosed appellant as suffering from psychoneurosis. Their judgments are in complete accord with that of appellant's own attending physician, Dr. Hodges, who, upon the request of the Social Security Administration, examined appellant and reported:

"I do believe that he has a rather marked and deep psychoneurosis, and the likelihood of this man ever working is remote. I do not think that he would

work at any job at any time it would be offered to him. To that end he is completely disabled."

Under ordinary circumstances, a Hearing Examiner's finding that an applicant for disability benefits lacked the motivation to work would be entitled to some weight; but when the applicant is suffering from psychoneurosis, lack of motivation to work is irrelevant. In such an affliction, it is held that lack of such motivation to work is, in itself, one of the symptoms of the disorder from which appellant admittedly suffers. Thus, in Lippert v. Ribicoff, D.C., 215 F.Supp. 28, 34, the court had occasion to pass upon a similar question and said:

"The interdependent relationship of plaintiff's ailments and the totality of their effect upon plaintiff's physical and mental capabilities to perform any substantial activity, though misused by the Examiner, was recognized by the doctors retained by the Secretary. The Examiner quoted from Dr. Pope's Report the internist's opinion that it is difficult to evaluate plaintiff '* * * because one sees men with no more disability than this man presents but with proper motivation performing very adequately.' Record, p. 16. Dr. Pope concludes: 'I'm afraid his lack of motivation will probably interfere with his performing adequately in any position in which he is placed.' Record, p. 101. The Examiner apparently relied on these statements to support a finding of no disability. *However, the law compels that such medical evidence is more proof of disability rather than the contrary.* As was stated in Ollis v. Ribicoff (W.D.N.C.1962), 208 F. Supp. 644, at 648, plaintiff's 'physical and *mental* capacity to resist or adapt' to his impairments is a 'proper basis for evidentiary inferences on these matters. Underwood v. Ribicoff, supra.' [Emphasis added.] Thus, the culminating effect of these many ailments upon plaintiff must be weighed solely on the basis of the effect upon this particular man, not upon what the effects might be on *others*." (Emphasis supplied.)

The Hearing Examiner, in his decision, stated that appellant "admitted that he could drive a pick-up truck and that he knows at least one person who makes a living by driving a pick-up truck." By this statement, he implied that appellant could make a living driving a pick-up truck. To show the lack of basis for this kind of conclusion, we quote the testimony on the subject. Claimant had no legal assistance at the hearing. The Hearing Examiner cross-examined appellant. In answer to a question as to whether he could drive a truck, appellant said he could not; that his legs were too weak; but, that "I've drove a pickup truck." He never stated that, at that time, he could drive a pickup truck or that he could make a living out of it; but in answer to another question of the Hearing Examiner, as to whether there are people who make a living out of driving pickup trucks, he merely said he knew a mail carrier, "and he's makin' a livin' at it, I reckon."

The foregoing is a most unsubstantial fragment of colloquy on which to imply and base a holding that this particular man with his admitted psychoneurosis and other physical impairments could make a living as a delivery man driving a pickup truck. Such a conclusion is similar to the Hearing Examiner's conclusion in Ihnen v. Gardner, D.C., 253 F.Supp. 541, 547, that the claimant could work as a delivery man, where the court held that such a conclusion was not supported by substantial evidence, and that "[f]ew occupations would require a greater degree of mobility than that of a delivery man."

In conclusion, the Hearing Examiner found that there was no objective medical evidence that appellant had any physical impairments whatever. In this finding, the Hearing Examiner wholly ignored the written report of Dr. W. C. Hambley, which was in evidence, wherein that physician reported diagnoses of coronary artery disease with insufficient reserve, which were supported by electrocardio-

gram findings upon which Dr. Hambley based his opinion that appellant was totally and permanently disabled. Dr. Clarke had filed a report, in evidence before the Hearing Examiner, in which he diagnosed appellant as having second stage pneumoconiosis on X ray examination, and stated that "patient has been in my office regularly and his condition has remained unimproved. * * * This patient is permanently and totally disabled because of the above." These are only two instances of evidence by two of the physicians treating appellant over a considerable period of time, who presented objective medical evidence of appellant's condition, and their opinion, as physicians, that he was totally and permanently disabled.

There was no testimony that appellant was not disabled; there was no evidence that he could do any work of any kind; and his three attending physicians stated he was totally and permanently disabled.

 The evidence of physicians who have been treating a patient over a long period of time and who state that he is totally incapacitated, is substantial evidence as compared with the evidence of physicians who have examined appellant on only one occasion, and whose reports are inconclusive, fragmentary, uncertain, and not contradictions of unqualified evidence that the patient is totally and permanently disabled. Where expert medical opinion as to disability and inability to engage in any substantial, gainful employment is not controverted by substantial evidence to the contrary, the adverse decision of the Secretary must be reversed. Teeter v. Flemming, 270 F.2d 873, 77 A.L.R.2d 636 (C.A.7). See also Sebby v. Flemming, D.C., 183 F.Supp. 450; Thomas v. Celebrezze, 4 Cir., 331 F.2d 545; Celebrezze v. Walter, 5 Cir., 346 F. 2d 156, and Wooten v. Celebrezze, D.C., 259 F.Supp. 685.

Here, there is no question that appellant was suffering from psychoneurosis. Every medical witness in the case agreed in that conclusion. Dr. Hodges' evidence is undisputed by any substantial evidence that appellant had a marked and deep

psychoneurosis; that the likelihood of his ever working again was remote; and that, in his opinion, appellant was completely disabled.

In Miracle v. Celebrezze, 351 F.2d 361, 378 (C.A.6) the court said:

"When a claimant comes forth with evidence of serious physical impairment, the record must contain evidence on which the denial of the claim may be based; and *where there is uncontroverted medical testimony that the applicant is unable to engage in any substantial gainful activity, it is the duty of the Secretary of Health, Education, and Welfare to award him the relief requested,* assuming that all other qualifications are met. Davis v. Celebrezze, 213 F.Supp. 477 (D.C. Tex.); Williams v. Celebrezze, 228 F. Supp. 627 (D.C.Ky.); Jarvis v. Ribicoff, 312 F.2d 707 (C.A.6)." (Emphasis supplied.)

In accordance with the foregoing, the judgment is reversed, and the case remanded to the Secretary for the allowance of disability benefit payments to appellant.