Claude B. MILES, Plaintiff,

v.

SECRETARY OF HEALTH, EDUCATION & WELFARE, Defendant.

Civ. A. No. 1994.

United States District Court,
W. D. Tennessee, E. D.

Feb. 17, 1971.

2. Miss., 242 So.2d at 698.

Billy Townsend, Parsons, Tenn., for plaintiff.

Kemper Durand, Asst. U. S. Atty., Memphis, Tenn., for defendant.

OPINION

WELLFORD, District Judge.

The claimant, Claude B. Miles, filed an application for disability and disability insurance benefits on October 31, 1967, under Sections 216(i) and 223 of the Social Security Act, 42 U.S.C. Sections 416(i) and 423. The defendant, Secretary of Health, Education and Welfare, through his representative, disallowed his application. The claimant requested reconsideration on February 16, 1968, and again his application was denied. Claimant thereupon filed a request for a hearing, and on August 9, 1968, appeared before a hearing examiner for a *de novo* hearing. After considering all the evidence, the hearing examiner again found that claimant Miles was not under a "disability" as defined by the Act and therefore denied his application. Claimant Miles, through his attorney, then requested a review of the examiner's decision. The Appeals Council of the Social Security Administration granted the request for a supplemental hearing and ordered that a vocational expert be secured to investigate and to testify. The case was thereupon remanded to another hearing examiner for the taking of additional evidence. A second hearing was held on October 15, 1969, at which additional testimony (medical and other) was presented. The hearing examiner, after considering the entire record as supplemented, found that the claimant was not under such disability as to qualify him for the benefits applied for. This became the "final decision" of the Secretary of Health, Education and Welfare, after the Appeals Council affirmed the hearing examiner.

Claimant now seeks judicial review of the Secretary's decision, urging that (1) the findings of the Secretary and his hearing examiner are not supported by substantial evidence as required by Section 205(g) of the Social Security Act, 42 U.S.C. Section 405(g), and (2) that the examiner applied erroneous legal standards to the evidence.

The evidence in the record indicates that claimant was born September 18, 1908. He filed for disability benefits on October 31, 1967, alleging that he first became unable to engage in any substantial work in 1966, and voluntarily quit his job on March 20, 1967. Claimant attributed his disability to arthritis and acute pain in his muscles and his body tissue. He has had an eighth grade education but no special training except through job experience. Claimant worked for Bush Building Company, as a mechanic on heavy road equipment for about 12 years and was, at the time of his voluntary termination, earning $3.29 an hour. For a number of years before he had engaged in the same type of work duties, for Miles Construction Company and for Marion Construction Company, both involved in heavy equipment. As a young man, claimant worked as a clerk in a grocery store, and has had a few odd jobs since he left the Bush Company. He drives an automobile, but must get out and rest periodically.

Claimant alleges that he suffered pain when sitting or standing. He also complained of numbness in his hands, neck, shoulders, and forearms, and that he was unable to remain comfortable in any position but for short durations. He also states that he has not been able to do any hunting or fishing, which had previously been his avocation, because of his pain. Claimant testified that he can help his wife with housework at times, and that he periodically works in his small garden. He does take some limited exercises on his own initiative, although the doctors who have examined him have not suggested that he do so. He stated that he walked on the average of four or five (4 or 5) city blocks a day and mowed his lawn with a power riding mower. Claimant also testified that he received maximum unemployment compensation benefits after leaving his last employer for a period of six (6) months. He now has no disability insurance and receives no assistance from the Department of Public Welfare. He is not a veteran, and has no source of income except from his wife who does work. Claimant and his spouse own their furniture and automobile but not their house, having apparently sold their home to realize proceeds for necessary living expenses.

I

*Substantial Evidence*

The record includes numerous and conflicting medical reports of examinations of the plaintiff over the past four (4) years. The hearing examiner found that the claimant had failed to show by competent medical evidence that he was suffering from a "disability" as defined in the Act.

42 U.S.C. Section 423(d) (1) defines "disability" as:

" * * * (A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months; or

\* \* \* \* \* \*

(2) For purposes of paragraph (1) (A)—

(A) an individual (except a widow, surviving divorced wife, or widower for purposes of section 402(e) or (f) of this title) shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which ex-

ists in significant numbers either in the region where such individual lives or in several regions of the country.

\*   \*   \*   \*   \*   \*

(3) For purposes of this subsection, a 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."

The hearing examiner concluded "(i)t is entirely possible that the claimant can no longer engage in his former occupation of heavy equipment mechanic." He further concluded, however, that there are many "lighter occupations in which the claimant could engage \* \* \*" which are "within \* \* \* (his) physical, mental and vocational capabilities, and are present in significant quantities in the local, regional, and national economy."

█ The claimant has the burden of proof in establishing disability. (42 U. S.C. § 423(d) (5) ) ; Henry v. Gardner, 381 F.2d 191 (CA 6, 1967). Brady v. Gardner, 294 F.Supp. 870 (DC, Va., 1968). The function of the District Court in reviewing a "final decision" of the Secretary is to determine whether the Secretary's findings are supported by substantial evidence. Hunt v. Gardner, 354 F.2d 692 (CA 6, 1966) ; King v. Celebrezze, 341 F.2d 108 (CA 6, 1965). "Substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Miracle v. Celebrezze, 351 F.2d 361, 378 (CA 6, 1965).

Since the medical reports do not indicate agreement as to whether the claimant is "disabled" under the Act, the Court must direct its attention to these medical examinations made of the claimant to determine whether the Secretary's decision is supported by substantial evidence.

The claimant was first examined by Dr. Carter Williams, Jr., a specialist in internal medicine, on February 1, 1967, who saw this claimant on several occasions. The plaintiff related a three (3) months history of substantial muscle pain involving much of his body. The claimant was admitted to the hospital on February 7, 1967, by Dr. Williams as attending physician, for evaluation and treatment of his general condition. Most of the laboratory and diagnostic tests at that time were within normal limits. A chest x-ray showed some evidence of pulmonary fibrosis in the lung bases. Clinically it was felt that the claimant had polymyositis with an effort made to determine if there was an underlying malignancy. No malignancy was found, however. Dr. Williams again examined the claimant on November 3, 1967, after claimant related to him of his inability to work because of persistent muscle aching and soreness. Dr. Williams concluded: "Physical exam at this time was unchanged except for limited movement because of muscle pain."

Dr. Robert M. Fisher of Parsons, Tennessee, reported that the claimant was readmitted to the hospital on February 5, 1968. From his examination of the claimant, Dr. Fisher's resulting diagnosis was "myositis etiology undetermined"; in February, 1968. This was essentially the same diagnosis as Dr. Carter Williams had made previously.

Also, in February, 1968, the claimant was first examined by Nashville physician Harrison J. Schull. Dr. Schull felt that he was unable then to make a specific diagnosis in view of the lack of positive findings on laboratory studies and physical examination. He did state, however, that he was "impressed with Mr. Miles' sincere feeling that he was unable to carry on his work without some form of medical help." In spite of the lack of positive findings, Dr. Schull felt that claimant "probably had a disturbance involving connecting tissue and/or muscle and ascribed the diagnosis of Myositis to him."

Dr. Schull later, however, concluded (January, 1969):

"It is our impression that Mr. Miles is sincere in his complaint of discomfort; that he likely does have some bizarre form of connective tissue and/or muscle disorder, the exact nature of which we cannot categorize. Unless some better explanation and less harmful therapy than predisone can be found for his problem, he will continue in his present situation unable to hold a regular job in my opinion."

On March 21, 1968, Dr. Albert P. Isenhour, a Nashville urologist, examined the claimant and concluded:

" * * * quite obviously a more extensive medical evaluation is necessary, with the addition of a neurological and possibly an orthopedic consultation. At the present time this man is apparently unable to perform any satisfactory work, however, there is (sic.) no apparent urological difficulties."

Dr. A. Roy Tyrer, Jr., a Memphis neurological surgeon, thereafter examined the claimant on April 30, 1968. He stated that there were no definite abnormal neurological findings. There was no evidence of muscular atrophy. The cranial nerves were negative, and sensory modalities were intact in all extremities. On the other hand, he did observe that the claimant walked with caution because of thigh soreness and that he could not extend his arms overhead because of the soreness of shoulder muscles and that definite reflexes could not be obtained in the arms. Knee reflexes were hypoactive but present, and ankle reflexes were equal. Dr. Tyrer concluded that he was unable to make a definite diagnosis but did not feel that the claimant had any primary neurological disease.

The medical evidence than available was submitted to and reviewed by Dr. G. A. Meyer, neurosurgical consultant of the Bureau of Disability Insurance of the Social Security Administration in the summer of 1968. Dr. Meyer stated that it was his opinion that "the medical evidence in this case is adequate. There are one or two border-line or slightly abnormal laboratory tests, but other than this, we have no objective findings, except for decreased deep tendon reflexes of the upper extremities." He thought that an electromyography was of critical importance in this case and that the claimant should be referred to a medical neurologist trained in this technique. He also advised "specific laboratory tests to rule in or out a primary muscle disease".

Dr. Charles A. Cape, a University of Tennessee specialist in neurology, first examined the claimant in September, 1968. The neurologic examination revealed no evidence of cranial nerves dysfunction. He reported no evidence of facial weakness, no atrophy, weakness, or sensory loss in his upper extremities. The claimant's coordination was normal, however, an examination of the lower extremities revealed a gait that was very stiff-legged, slow, and methodical. The claimant related that he was unable to work because of the sore muscles in his thighs. Dr. Cape stated that this soreness prevented "him from hopping adequately, but he does have adequate strength to hop. He can step on a small stool, but is unable to step on a chair. Again, he states that he is unable to do this because of the severe pain." An examination of his lower extremities, however, revealed no definite weakness. Dr. Cape stated that the claimant gave a very good clinical history for polymyositis, however, because he was taking predisone, his illness, if any, was marked and he consequently had no definite objective evidence of this disease. Dr. Cape concluded that Mr. Miles had no objective medically demonstrated dysfunction but that he had a "100% subjective disability."

Dr. Cape examined the claimant again in 1969, and at that time stated that there were no neurological findings that had not been present in September, 1968. His diagnosis at that time was

"atrophy skeletal muscle, neurogenic in type." He stated in his May, 1969, testimony:

"My impression can now be stated very definitely. This man has no clinical, electrocal, or pathological evidence of polymyositis. However, he does have a peripheral neuropathy. The etiology of this peripheral neuropathy cannot be stated at this time, because absolutely no diagnostic studies to work out such an etiology have been performed."

On October 11, 1969, claimant was examined by Dr. Carver E. Wentworth, a chiropractor. He reported that the cranial nerves appeared intact, that the claimant had a slow methodical gait and complained of muscle, bone and tissue soreness. Various neurological tests were positive, and Dr. Wentworth concluded the claimant suffered from a static, or paralytic or myopathic scoliosis of the lumbo sacral area with antcylosis of the upper cerevical vertebrae developing. He stated:

"I have performed no tests which would indicate that his complaints of pain and discomfort are anything but genuine * * * I am of the opinion that Mr. Miles is not capable of performing any kind of labor to which he has been accustomed and seriously doubt that he can perform any manual labor for any appreciable duration at all."

Dr. Cape further testified at the hearing after remand on October 15, 1969, that claimant did have a peripheral neuropathy but the etiology of the neuropathy could not be stated at that time. He further stated that the claimant may have had polymyalgia rheumatica but that this diagnosis could not be made with certainty because the peripheral neuropathy clouded the clinical picture. He added that the neuropathy should not substantially limit the claimant's physical abilities in any way except that he would not be able to stand on his feet all day and would not be able to engage in heavy lifting. He also stated that peripheral neuropathy

"in the great majority of cases is not and does not produce the pain that he describes. Most people with this degree of peripheral neuropathy continue to work and have very minimal objective complaints.

* * *

I believe in this case there is a great deal of functional and psychiatric overlay to a very minor organic disease."

Thereafter, Dr. Copple, a clinical psychologist, examined the plaintiff in November, 1969. Intelligence testing indicated that claimant had a full scale I.Q. of 106. There was no suggestion that there was any basic central nervous system disorder, nor any mental condition which would likely be responsible for symptoms such as the claimant had manifested.

Dr. Louis Sampson, a Nashville psychiatrist examined the plaintiff in November, 1969, at the request of the defendant. The tests administered showed that Mr. Miles was oriented as to time, place and person. His intelligence was normal. Dr. Sampson thought the claimant to be "severely depressed".

Based upon the above medical evidence which has been summarized herein, the hearing examiner concluded (1) "the claimant has failed to show by competent medical evidence that he was suffering from an impairment or impairments of such severity as to preclude him from engaging in any substantial gainful activity at any time for which his application was effective, and (2) "none of the examining or attending physicians have been able to determine the presence of any disabling disorder after giving every reasonably known and medically accepted clinical and diagnostic test."

While the Court may not completely agree with the conclusion of the hearing examiner, as it would appear that some medical opinion in the record evidenced a clinical or determinable basis for the claimant's impairment, it cannot be said that the examiner's deci-

sion is without substantial basis in the record.

## II

### Legal Standards Applied to the Evidence

It is the contention of the claimant that the hearing examiner in defining "medically determinable physical or mental impairment" required that the claimant's pain or disability be "objectively" demonstrated and he thereby applied the wrong legal criteria to the evidence.

42 U.S.C. § 423(d) (3) defines "impairment" as:

"that resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."

The Court notes that the above is the result of recent amendments to the Social Security Act (see Pub.L.No. 90–248, Section 158 (Jan. 2, 1968) 81 Stat. 868, have amended Section 223(d) (42 U.S.C. Section 423(d) ). These amendments are applicable to the instant case and they clearly demand that the existence of an impairment must be established by medical, clinical or laboratory evidence. Whitt v. Gardner, 389 F.2d 906 (CA 6, 1968); Walters v. Gardner, 397 F.2d 89 (CA 6, 1968); Mullins v. Cohen, 408 F.2d 39 (CA 6, 1969).

To be sure the Act nowhere states a requirement that a claimant establish his disability by "objective" medical evidence. Courts have considered the infection of an examiner's findings by such an erroneous legal standard to be reversible error. Branham v. Gardner, 383 F.2d 614 (CA 6, 1967); Walston v. Gardner, 381 F.2d 580 (CA 6, 1967); Whitt v. Gardner, supra (CA 6, 1968).

It is true that the report of the first hearing examiner contained the following passage:

"There is no *objective* evidence of any disease that would prevent him from engaging in any type of work he has formerly engaged in or any type of light or sedentary work any man of his age, education, and experience might be expected to engage in." (emphasis added)

However, the report of the second examiner who had the benefit of all the pertinent testimony and evidence contained the following words:

" * * * but none of the examining or attending physicians have been able to determine the presence of any disabling disorder after giving every reasonably known and medically accepted clinical and diagnostic test."

A similar problem was encountered in Walters v. Gardner, 397 F.2d 89 at p. 91 (1968) wherein the Court stated:

"We cannot fault the examiner for his conclusion that appellant's proofs did not establish disability by the quality of proof now required. It is true that in his opinion the examiner made reference to the absence of 'objective' medical findings. Citing our recent case of Whitt v. Gardner, 389 F.2d 906, 909, 910 (6th Cir. 1968), appellant now asserts that the examiner arrived at his conclusion by employing impermissible standards. Considering the examiner's opinion as a whole, we are not persuaded that his conclusion was bottomed upon the absence of objective medical findings, and we are satisfied that appellant did not offer, nor did the record contain, evidence that he was suffering from abnormalities that had been demonstrated by 'medically acceptable clinical and laboratory diagnostic techniques.' "

The Court is of the opinion that the examiner did not search out and require only objective findings but, in fact, attempted to follow the statutory standards as set out in 42 U.S.C. § 423(d) (3) by seeking some "acceptable clinical and laboratory diagnostic techniques" to support claimant's disability.

Nor can it correctly be stated that the examiner ignored the subjective symptoms of pain advanced by claimant. The examiner clearly considered all the evidence and testimony regarding the sin-

cerity of claimant's complaints of pain and also was aware that pain alone might be a disability under the Act if properly substantiated by some clinical or laboratory test. As stated earlier, the burden of proving a disability rests upon the plaintiff, and in the present case the examiner has concluded that the claimant has not sustained that burden by his failure to prove that he cannot engage in any kind of substantial gainful work at all. This is a close case and the Court has been reluctant, under the circumstances, to sustain a finding against a claimant who is doubtless sincere, who has no record of any kind of malingering.

 One last contention of the claimant must be considered. The claimant avers that although the examiner felt that he might not be able to return to his former occupation, the examiner failed to show what light work the claimant could "realistically and practically" be expected to handle and thereby examiner failed to sustain his burden of showing that there were job opportunities available to claimant in the general area of his residence. See May v. Gardner, 362 F.2d 616 (CA 6, 1966).

At the request of the hearing examiner a vocational expert, Dr. Fred B. Pultz, appeared and testified that if the claimant suffered some neurological or muscular impairment or involvement but that if he retained the ability to use public or private transportation, and that if he retained the ability to use his arms, hands, and fingers and if he could sit and stand alternately, that there were a number of occupations in which he could engage. He also testified that although claimant could not remain on his feet all day and could not do any heavy lifting, there would still be *occupations* in which he could engage with these physical limitations in the general area of *claimant's* home. Dr. Pultz then proceeded to enumerate several possible occupations suitable for the claimant. It is clear from the record that the examiner approved these occupations and incorporated them into his decision by stating "there are many lighter occupations in which the claimant could engage, all as outlined by Dr. Pultz. All of the jobs outlined * * * are well within the claimant's physical, mental and vocational capabilities, and are present in significant quantities in the local, regional, and national economy." The Court believes that this is a sufficient showing on the part of the Secretary. Whitt v. Gardner, *supra*; Newman v. Gardner, 376 F.2d 25.

The Court is therefore of the opinion that there is substantial evidence in the record to support the examiner's finding that claimant is not so disabled as to be unable to engage in any substantial employment during the period in question. The Court also finds that the examiner applied proper legal standards to the extensive evidence adduced in the record.

Therefore, it is adjudged and ordered that the Secretary's decision be affirmed.