**Mildred C. BLACK, Plaintiff,**

**v.**

**Elliot L. RICHARDSON, Secretary of Health, Education and Welfare, Defendant.**

**Civ. A. No. 71–1253.**

United States District Court, D. South Carolina, Spartanburg Division.

March 29, 1973.

James B. Stephen, Spartanburg, S. C., for plaintiff.

John K. Grisso, U. S. Atty., Columbia, S. C., and Henry M. Herlong, Jr., Asst. U. S. Atty., Greenville, S. C., for defendant.

## ORDER

HEMPHILL, District Judge.

This is a suit by the plaintiff against the Secretary of Health, Education, and Welfare under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Secretary denying the plaintiff's application for the establishment of a period of disability under § 216(i) of the Act, 42 U.S.C. § 416(i), and for disability insurance benefits, as provided by § 223 of the Act, 42 U.S.C. § 423.

On February 8, 1971, the plaintiff filed an application for disability insurance benefits alleging inability to work or pursue any gainful activity since June 15, 1970. This application was initially denied by the Secretary on June 20, 1971, and was disallowed upon reconsideration by notice to plaintiff on August 8, 1971. Thereafter, plaintiff requested and received a hearing before a hearing examiner who by a decision dated November 5, 1971, denied the disability claim. The plaintiff requested a review of this determination by the Appeals Council, which after considering additional evidence, also denied the claim of the plaintiff on December 17, 1971.

The only issue before this court is whether or not the findings of the Secretary are supported by substantial evidence, and if they are the findings of the Secretary must be accepted. This court may not try the case de novo and substitute its findings for those of the Secretary. Flack v. Cohen, 413 F.2d 278 (4th Cir. 1969). This does not mean however that the findings of the administrative agency must be blindly accepted. On the contrary, the statutorily granted right of review contemplates more than an uncritical rubber stamping of the administrative action. *Flack* mandates a critical and searching examination of the record, and the setting aside of the Secretary's decision when necessary to insure a result consistent with congressional intent and elemental fairness. *Flack,* supra, at 279–280. See also Thomas v. Celebrezze, 331 F.2d 541 at 543 (4th Cir. 1964). As was stated by Judge McAllister in a recent Sixth Circuit opinion, and quoted with approval in Garrett v. Richardson, 471 F.2d 598, 604 (8th Cir. 1972):

"It used to be easy enough for an appellate court to affirm an administrative agency on the ground that the findings were supported 'by substantial evidence,' if it could find just a trace of evidence to support them. But that is not the case anymore. Congress grew critical of such affirmances which ignored conflicting evidence and, in turn, brought about harsh criticism of the courts for such decisions on the ground that cases were affirmed merely because the appellate court could find evidence in the record which, viewed in isolation, substantiated a Board's findings." Floyd v. Finch, 441 F.2d 73, 76 (6th Cir. 1971).

Substantial evidence has been defined by the Supreme Court as "More than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L. Ed.2d 842, 852 (1971). See also Kyle v.

Cohen, 449 F.2d 489, 492 (4th Cir. 1971).

■ As was stated in Dyer v. Richardson, 347 F.Supp. 478 (E.D.Tenn. 1972), quoting Consolo v. Federal Maritime Com., 383 U.S. 607, 619–620, 86 S. Ct. 1018, 16 L.Ed.2d 131 (1966), "It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." Id. 347 F.Supp. at 481. It is now clearly settled that written medical reports by a licensed physician who has examined the claimant may constitute "substantial evidence" in social security cases, despite their hearsay character, Perales, supra, 402 U.S. at 402, 91 S.Ct. at 1428, 28 L.Ed.2d at 853.

■ In order to establish a claimant's entitlement to social security disability benefits, there must be a showing that (1) there is a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months, and (2) that the impairment in fact caused an inability to engage in any substantial gainful activity. Harris v. Richardson, 450 F.2d 1099 (4th Cir. 1971); Hicks v. Gardner, 393 F.2d 299 (4th Cir. 1968) makes it clear that more than the objective medical facts are to be considered in this regard. As stated in Hicks:

Before making a finding of a claimant's ability or inability to engage in any substantial gainful activity as contemplated by the law, there is a duty to consider the objective medical facts, which are the clinical findings of examining or treating physicians divorced from their expert judgment or opinions as to the significance of the clinical findings; (2) the medical opinions of these physicians; (3) the subjective evidence of pain and disability testified to by the claimant and corroborated by other evidence; and (4) the claimant's background, work

history and present age. Id. at 302 (citations omitted).

■ It was also made clear in Hicks that a claimant's maladies must be considered in combination and not fragmentized in evaluating their effects on the claimant. Id. See also Branham v. Gardner, 383 F.2d 614 (6th Cir. 1967) [7].

■ The general rule is that in order to authorize denial of social security benefits on the ground that the impairment does not render the claimant unable to engage in any gainful employment, "there must be evidence to show the reasonable availability of jobs which the claimant can perform." Hayes v. Gardner, 376 F.2d 517 (4th Cir. 1967). The burden of proving disability under the Act rests on the plaintiff. Sliger v. Finch, 315 F.Supp. 1093 (W.D.Va.1970), aff'd Sliger v. Richardson, 436 F.2d 1385 (4th Cir. 1971); Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966). This burden need not, however, be carried to a point beyond a reasonable doubt, Thomas v. Celebrezze, 331 F.2d 541, 545 (4th Cir. 1964); Ketron v. Finch, 340 F.Supp. 845, 849 (D.C.Va. 1972). When a plaintiff shows that he is disabled from engaging in his former occupation, the burden shifts to the Secretary to come forward with a showing of other employment available to a person of plaintiff's age, education, work experience, skills, and physical limitations. Meneses v. Secretary of Health, Education, and Welfare, 143 U.S.App.D. C. 81, 442 F.2d 803 (1971); Hicks v. Gardner, supra, 393 F.2d at 301; Boyd v. Gardner, 377 F.2d 718 (4th Cir. 1967).

The plaintiff is a 44-year old white female who completed six years of schooling and has never had any type of specialized training or education. At age 18 she went to work in a textile mill and has worked continuously since then, with the exception of short absences to bear her two children. Her primary work in the mill was that of a weaver,

but on frequent occasions she would also operate the winder machine or would be a spooler attendant. On June 15, 1970, the plaintiff stopped work because of dyspnea (difficult or painful breathing) and hemoptysis, (the coughing up of blood).

A review of the plaintiff's medical history reveals she has had several serious operations over the years before the onset of her present trouble. In 1953 a subtotal thyroidectomy was performed for the removal of a benign goiter. In 1954, the claimant had a hysterectomy. Finally, in 1960, a benign tumor was removed from her right breast.

As a result of her dyspnea and hemoptysis noted above, plaintiff was referred to Dr. W. A. Morris[1] by her regular physician in Union, S. C., Dr. F. P. Owings,[2] in June of 1970 and was seen by Dr. Morris three to four days after the onset of the dyspnea and hemoptysis. She had been previously diagnosed as having bronchiectasis (an inflammation of the lungs which destroys the bronchial tubes), in 1964, and on July 20 she was admitted to Spartanburg General Hospital where she underwent bronchoscopy and a bronchogram. These tests disclosed that the entire lower lobe and middle lobe of her right lung were essentially completely destroyed by bronchiectatic disease. On August 4, 1970, she underwent a right thoracotomy and middle lower lobectomy to remove the destroyed lung tissue. Dr. Morris reported that plaintiff's wound healed well and she had done well postoperatively. She was discharged from the hospital on August 14, 1970. She was followed by Dr. Morris after her discharge and was last seen by him on December 7, 1970, at which time he reported that "she was doing well except for some dyspnea which is aggravated by exertion." In a report to the South Carolina Vocational Rehabilitation Department he stated:

This lady is disabled in that she is not able to do strenuous work because of dyspnea on exertion. Likewise, it was recommended that she not do any kind of work in dusty environment which might precipitate reactivation of any possible residual disease which would require loss of lung tissue.

In a letter dated September 16, 1971, he essentially restated his previous report and stated:

Postoperatively, the patient did quite well. Her symptoms of cough and hemoptysis were no longer present. She did have some dyspnea, especially on exertion as would be expected with the loss of lung tissue. She was followed in our office during her postoperative recovery period and last seen on December 11, 1970, at which time she was doing well and was discharged to return in one year for follow-up examination. In addition, it was recommended that this patient no longer work in a dusty environment where she may endanger further lung tissue. As to her disability, her limitation is that of shortness of breath and inability to work in a dusty environment. She has lost approximately one-third of her total lung tissue.

On May 6, 1971, Mrs. Black was seen by Dr. Walter G. Coker, M.D.[3] for a "comprehensive examination" at the request of Mr. B. J. Marett of the OASI State Office. In recording data on her condition at that time he observed:

She had an uneventful postoperative course and has done quite well in all respects since her surgery except for exertional dyspnea. She has had no

---

1. Dr. Morris is a graduate of the Medical College of Georgia, and specializes in General Surgery.

2. Dr. Owings is a graduate of the Medical College of South Carolina and is a General Practitioner with a subspeciality in General Surgery.

3. Dr. Coker is a graduate of the Bowman Gray School of Medicine of Wake Forest College, and specializes in Internal Medicine.

more chronic coughing or hemotysis. She has regained much of her former strength and endurance and has regained about fifteen pounds of her weight loss. She has no shortness of breath at rest. She estimates that at the present time she is able to walk for a distance of no further than one to two blocks at a normal pace on level ground before having to stop because of shortness of breath. She has been told by her doctor that he would not allow her to return to textile work "because of the dust and lint in the mill."

He also noted that during a routine visit to her physician (Dr. Owings) three weeks before, she was found to be a mild diabetic but was not required to take medication to control it. This is the only place in the record where diabetes is mentioned. Similarly, this is the only place where mention is made of nervousness. On this point, Dr. Coker observed:

> She is taking no medications at the present time excepting a small, yellow tablet four times daily "for nerves." She admits to excessive amounts of tension, nervousness, anxiety, and insomnia for the last two years but she denies ever having had psychiatric treatment.

Additionally, under the heading "System Review" is the entry *"Head:* Much dizziness with position change. No other complaints."

Dr. Coker conducted Respiratory Function Studies using the Air-Shields Pulmonary Function Recorder and attached the graphs of these tests to his report. He did not however make any evaluation of these tests or make any comments as to the significance of them. In his concluding remarks he observed:

> She does not have a chronic cough at this time. There are no physical findings at this time which might indicate the presence of chronic lung

disease. The applicant was not short of breath at rest and did not become short of breath with ordinary activity during her stay in my office.

At the hearing, Dr. William W. Pryor [4] appeared as a medical advisor for the Secretary. His primary testimony was concerned with the interpretation of the pulmonary function studies as contained in Dr. Coker's report. He first noted that the plaintiff appeared to have had considerable difficulty in doing the "so-called FEV curves which are single breath tests." He stated that these tests showed considerable reduction, in both the total amount of gas that the patient could blow from her lungs and the rate at which she could expel it from her lungs, the total amount being a little over half (54%) of the figure predicted for a normal person of her age, size, and sex, and the amount she could get out in one second being "markedly reduced" (21% of predicted value, 33% of measured value). He then commented:

> The problem with that is, the more difficult test to perform—the so-called MVV, in which the patient breathes in and out very rapidly for ten seconds —approaches normal; so that is the much more difficult test to perform, and it means that the problem with the FEV curves actually was one of performance rather than being simply a matter of having lost a lot of lung volume. In general, you can take out two lobes of the lung and not affect the timed vital capacity significantly. The total amount of air you get in the lung obviously reduces some if you take out, you know, two parts out of five; obviously, you don't have as big a lung as you had to begin with. On the other hand, the reduction is not linear. In other words, it's not a two-fifths reduction. It would be closer to about a third or a little less; it's not quite as severe. *So that basically the thing that doesn't add up in*

---

4. Dr. Pryor is a graduate of Duke University School of Medicine and specializes in Internal Medicine with a sub-speciality in Cardiovascular Disease. (At the hearing he indicated an additional subspeciality in pulmonary diseases.)

*the pulmonary function is that the one in which she should have had the most trouble doing and one that requires really the most cooperation and effort is the one she did the best with:* She was able to breathe 56 liters a minute with a predicted for her 60. Now, frankly, this 60 to me is a little bit on the low side for her age. I don't know which tables they used to predict this. It was obviously used from this particular machine, but 50 liters a minute is a reasonably good FEV. If we have somebody who has got 56 liters a minute, we are generally willing to take out the lung at that point. We are willing to sacrifice some more yet, so that is not a real bad figure, 56 liters.

Q. What did they mean here by 93 percent of predicted?

A. Well, the table he used for this machine—this is an air shield, according to Dr. Coker's letter here. These machines come with a calibration table which is based on a patient's, you know, age, sex, weight. It is what you should do if you are a certain age and certain weight and height. You change with age, you know. Everybody loses a little bit of their ventilatory capacity as they get older. The machines are different. One machine may give you a higher reading than another one, so we will have to go on this. He took that 60 off his table that goes with his instrument, but what I am saying in absolute terms, 56 liters is not a bad maximum ventilatory volume on anybody's tables' comparison. It is not normal. If she were absolutely normal, I would have anticipated closer to 70 liters or 75 liters for a woman this age and height and all. I think, of our instruments, I would have thought it would be a little bit higher, *but the real surprising point is most people can do these single breath tests so much better than they can do the multiple breath tests.*

Q. Now, the 93 percent predicted, what does he mean by that, that he would predict—

A. Well, if you just divide 56 by 60, you will get 93 percent. That's all he has done there, you see; he took what the predicted was and just divided it with what she did by that and come out with 93 percent performance.

Q. That is almost normal, isn't it?

A. Yes, sir. That would be considered normal for this instrument and for this MVV. *But, now, on the other test, the single breath test which, as I say, most people do better than they do this other one, her predicteds fall way below on every one of them.* [Emphasis added.]

On cross examination by plaintiff's counsel, when asked if the first tests were invalid, Dr. Pryor answered:

A. I don't think it represents a maximum, you know. It is a matter of, if she did it over again she might do it much better. This is a matter of learning process in some of these tests. *It's really interesting that she was able to do the second one better than the first one, because generally it takes more cooperation for the second than the first one.* [Emphasis added.]

Also present at the hearing as an adviser to the hearing examiner, was Dr. Clifford I. Holliman, Jr.,[5] a vocational consultant. Dr. Holliman testified, after being presented with certain presumptions as to the claimant's limitations due to her lung impairment, (basically that she would be limited to sedentary types of employment) as to work in the region which plaintiff would, in his opinion, be capable of performing. Dr. Holliman started out by stating that there were some 323,000 sedentary-type activities in the state and local economy, some of which would be available in the local area. Certain of these jobs he ruled out

5. Dr. Holliman has a Master's degree in psychology and a Ph.D. degree in counseling. He is self-employed as a con- sultant in psychological evaluations and vocational appraisals.

due to dusty conditions which might irritate the plaintiff's lung condition. He did not entirely rule out jobs in textile mills, such as handkerchief hemmer, shirt inspector, and shirt packer, stating that many textile mills were now air-conditioned. He also suggested such jobs as bottle inspector in the local Pep-to-Bismol plant; mail sorter; capacitor welder; and counter sales type occupations, particularly those of a sedentary cashier type.

The plaintiff, in her testimony at the hearing, indicated that following her operation it was not until about February 1971, (some eight months), that she was able to drive her car, and that she went to Vocational Rehabilitation shortly thereafter seeking help in finding a job. As of the time of the hearing, Vocational Rehabilitation had not been successful in placing her and she stated that she had not found anything on her own. A letter from Mr. Lewis E. Lancaster, a counselor with Vocational Rehabilitation, confirms plaintiff's testimony on this point, and indicates that she had been most cooperative. An affidavit, submitted by the plaintiff subsequent to the hearing and considered by the appeals' counsel, indicated her further contacts with Mr. Lancaster and continuing efforts to find a job. It also indicated several types of work she could not tolerate due to dusty conditions, strong odors from dyed fabric, and smoke and fumes in a cafe or grill.

Plaintiff also testified at the hearing that she is unable to work due to being short of breath all the time. In response to a question concerning improvement since the operation, she stated that the only improvement was that she was no longer hemorrhaging, but that her shortness of breath was worse and she had to gap [sic] for it, and that she tired very easily. This was verified by her daughter who testified that plaintiff gasped all the time and that whenever plaintiff did anything such as cooking or grocery shopping she had to lie down.

From the record it is clear that the plaintiff is suffering from an impairment which is of such severity that it prevents her from returning to her former occupation, thus meeting the first requirement of the two part test, supra. This was in fact one of the findings of the Secretary, and this being so, the burden shifted to the Secretary to show other substantial gainful activity which plaintiff could perform. As was noted in *Meneses*, 442 F.2d at 807, under the 1967 Amendment to the Social Security Act, the Secretary's burden is much lighter than it was formerly. The Secretary now needs only to come forward with proof that there are substantial job opportunities in the national economy that can be occupied by persons of the claimant's background and condition. Indeed, it is exceedingly clear, that despite the fact that Judge Sobeloff's observation in Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964),[6] is as valid today as it was then in assessing the reasonableness of claimant's employability, the 1967 Amendment[7] took this factor

---

6. "* * * Employers are concerned with substantial capacity, psychological stability, and steady attendance; they will not unduly risk increasing their health and liability insurance costs." 331 F.2d at 546.

7. Section 223(d) of the Social Security Act, 42 U.S.C.A. § 423(d) provides the definition of disability as used in the Act, and § 223(d)(2), 42 U.S.C.A. § 423 (d)(2) further provides:
   (2) For purposes of paragraph (1)
   (A)—
   (A) an individual * * * shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, *regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.* For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either

from the consideration of the court. As was stated by the court in Whiten v. Finch, 437 F.2d 73 (4th Cir. 1971):

> * * * Under the amended Act, the courts are not to be concerned about the availability of jobs in the community or even their availability to one with the claimant's impairments, *but only with the question of the claimant's ability to engage in gainful activity.* Id. at 74 [emphasis added].

The harshness of section 223(d) is clearly recognized by the courts at the appellate level, but they are powerless to change it. However, as noted by the Third Circuit,

> * * * We think it is not too much to require that an administrative decision that a claimant is not eligible because of the restrictions imposed by that section [§ 223(d)] be supported by explicit findings of all facts that are essential to the conclusion of ineligibility. Choratch v. Finch, 438 F.2d 342, 343 (3rd Cir. 1971).

■ Not only should the Secretary be held to an exacting standard as to his findings of all facts essential to his conclusion of ineligibility, he must comply with the proper legal standards in reaching his findings. As was stated in Branham v. Gardner, 383 F.2d 614, 626 (6th Cir. 1967), "[t]he facts must be evaluated by the administrator in the light of correct legal standards to entitle the administrative findings to the insulation of the substantial evidence test."

In Flake v. Gardner, 399 F.2d 532 (9th Cir. 1968),[8] the court held that:

> Even though the findings be supported by substantial evidence, the decision should be set aside if the proper legal standards were not applied in

weighing the evidence and making the decision. Id. at 540.

The Secretary appears to have placed considerable weight on the findings of the pulmonary function studies performed by Dr. Coker and interpreted by Dr. Pryor. From the record, as noted above, it appears that Dr. Coker in his report made no evaluation of his findings, this function being performed by Dr. Pryor at the hearing in his role as medical adviser to the hearing examiner. While the use of "medical advisers" in disability hearings was approved in Richardson v. Perales, 402 U.S. 389, 408, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), it is not at all clear whether the court thereby held that such an adviser's testimony can constitute "substantial evidence." Browne v. Richardson, 468 F.2d 1003, 1006 (1st Cir. 1972). In approving this practice the Court observed:

> The trial examiner is a layman; the medical adviser is a board-certified specialist. He is used primarily in complex cases for explanation of medical problems in terms understandable to the layman-examiner. He is a neutral adviser. This particular record discloses that Dr. Leavitt explained the technique and significance of electromyography. He did offer his own opinion on the claimant's condition. That opinion, however, did not differ from the medical reports. Dr. Leavitt did not vouch for the accuracy of the facts assumed in the reports. No one understood otherwise. 402 U.S. at 408, 91 S.Ct. at 1430, 28 L.Ed.2d at 856. [Emphasis added.]

This language would appear to clearly place the "medical adviser" in the limited position of *advising* the hearing examiner as noted above, as opposed to testifying.

■ Not only is it unclear whether Dr. Pryor's opinion can constitute sub-

---

in the region where such individual lives or in several regions of the country. [Emphasis added].

8. *Cf.* Dixon v. Gardner, 406 F.2d 1035, 1037 (4th Cir. 1969). See also Garrett

v. Richardson, 471 F.2d 598, 604 (6th Cir. 1973), (which also sets out in detail at page 599 the legal standards to be applied) ; Knox v. Finch, 427 F.2d 919, 920 (5th Cir. 1970).

stantial evidence, especially when it is recognized that at no time did he examine the plaintiff, see *Perales,* supra, at 402, 91 S.Ct. 1420, but also from the record it is not at all clear that he placed any trust in the validity of the pulmonary function studies he interpreted. Time and again he commented on the fact that the plaintiff performed best on the part of the test which logic dictated she would have the most difficulty with, and vice versa. Additionally, he indicated that he considered the predicted value of 60 liters on the test which she did best on, scoring 93% of predicted with an actual value of 56 liters, to be too low. Dr. Pryor indicated that he would have anticipated closer to 70–75 liters as the predicted value, which would have produced a score of as low as 74.7% of predicted if the higher figure were used. While Dr. Pryor explained that the machine used for the test was different from the type he was accustomed to, and that each type of machine has different tables, the apparently illogical results obtained and the 18.3% difference produced if Dr. Pryor's figures were used, casts sufficient doubt upon the validity of the test to deny it the status of substantial evidence.

██ The court must next consider whether or not the proper legal standards have been applied in this case. In the standard *pro forma* statement commencing the portion of the hearing examiner's findings labled, "Evaluation of the Evidence", it is indicated that the evidence has been carefully studied and reviewed together with the symptomatology and diagnostic interpretations contained in the medical reports. However, from a careful review of the record it does not appear that the hearing examiner gave any consideration, much less any weight, to the plaintiff's subjective symptoms as they were related by the plaintiff and by her daughter. While it is clear that the weighing of evidence is the province of the Secretary, and the Secretary and not the courts is charged with resolving conflicts in the evidence,

Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964), it is also clear that a plaintiff's subjective symptoms are one of the four elements which must be considered in determining whether a claimant is disabled, Hicks v. Gardner, 393 F.2d at 302, and that to disregard a claimant's subject symptoms is error. DePaepe v. Richardson, 464 F.2d 92, 99 (5th Cir. 1972). As was noted in Bittel v. Richardson, 441 F.2d 1193, 1195 (3rd Cir. 1971), a subjective determination of a claimed disability is required by 20 C. F.R. § 404.1502. Symptoms which are real to the claimant, although unaccompanied by objective medical data, may support a claim for disability. *Bittel,* supra at 1195. In this regard, a comment by Dr. Pryor is particularly noteworthy. In reply to a question by the hearing examiner as to the degree of work claimant could engage in he stated in part:

Now, there are many, many patients who have had this same operation this lady has that do light work. Some even do more. *It depends on the individual.* It is not a crippling operation, generally, you know; it's not really a crippling operation. The shortness of breath problem sometimes gets very difficult to explain. *Pulmonary function tests, just like her breathing capacity here, as far as the more difficult test is pretty good. Yet, through the record, the patient has complained of shortness of breath. This may be difficult to explain at times because sometimes people are short of breath who have never had anything wrong with their lungs, you know. You can't find any explanation for it.* [Emphasis added.]

It is clear from the record that the plaintiff's sincerity and cooperativeness in both the pulmonary function testing and in her efforts to obtain work through Vocational Rehabilitation were never in question. However, the Secretary chose to rely on a questionable pulmonary function test to the total disregard of plaintiff's subjective symptoms.

From a review of the record as a whole this court cannot say that the findings of the Secretary are supported by substantial evidence or that the proper legal standards have been applied in this case. Either of these findings preclude granting the Secretary's motion for summary judgment and require the overturning of his decision.

In light of the questionable results of the pulmonary function test it is the opinion of this court that this case should be remanded to the Secretary for further findings in this regard. It is further directed that the question of the plaintiff's "excessive amounts of tension, nervousness, anxiety, and insomnia for the last two years" noted in Dr. Coker's report, be considered further, along with the questions of her "mild diabetes", and dizziness on head motion, and that the Secretary apply the proper legal standards in reconsidering this case.

This court could not help but note with some concern the manner in which the hearing in this case was conducted. From the record it appears that every effort was made to accommodate the hearing examiner's medical and vocational adviser's time schedules to the total disregard and disruption of the plaintiff's testimony. While it is understandable that professional men have busy schedules and command high fees for their time, it must not be forgotten that taxpayers and claimants too are entitled to consideration by the government which exists to serve *them*. To paraphrase Judge Boque's comment in Garrett v. Richardson, 471 F.2d 598, 604 (8th Cir. 1972), the district courts are already overburdened with cases without having to correct every examiner's decision for the misuse or complete disregard of correct standards in cases such as this.

This case is remanded to the Secretary for further proceedings not inconsistent with this decision.

And it is so ordered.