996 F.2d 1214
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Bobby G. BLACKBURN, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 92-5731.
 United States Court of Appeals, Sixth Circuit.
 June 15, 1993.
 
 Before BOGGS and BATCHELDER, Circuit Judges, and MANOS, Senior District Judge.*
 PER CURIAM.
 
 
 1
 Plaintiff-appellant Bobby Blackburn's claim for Social Security disability benefits was denied. On appeal, he argues that the decision of the Administrative Law Judge was not supported by substantial evidence. Because of the deference owed to the Secretary's determinations, we must affirm.
 
 
 2
 * A. Procedural History
 
 
 3
 In 1972, Claimant Bobby Blackburn filed an application for disability benefits claiming physical and mental disabilities. In March 1977, an ALJ denied benefits and the denial was affirmed by the district court in 1981 and a panel of this Court in 1982.
 
 
 4
 In 1985, Blackburn again filed for disability benefits alleging disability since 1972. The Secretary determined that Blackburn could only claim disability for the period of March 1977 to December 1977 because (1) the earlier denial was res judicata for all claims prior to March 1977 and (2) the claimant's insured status expired at the end of 1977.
 
 
 5
 Blackburn's application for this nine-month period was denied at the administrative levels. In 1987, Blackburn was given a hearing before an ALJ and the ALJ denied benefits. The appeals council affirmed, but the district court reversed and remanded because the testimony of the vocational expert at the hearing concerned job availability in 1987, instead of job availability in 1977, the relevant time frame. In 1989, further proceedings were held, but the tape recording of the hearing was lost. In 1990, the ALJ heard testimony from a vocational expert about job availability in 1977, and the ALJ denied benefits. The district court affirmed in 1991 and this appeal followed.
 
 B. Facts
 
 6
 In 1947, at age 12, Blackburn fell off a bridge and was unconscious for several hours before he was found. He suffered a closed head injury which resulted in a sudden mental impairment and set in motion a progressive deterioration in mental function. Notwithstanding this impairment, Blackburn worked successfully in the coal mines from approximately 1955 to 1972. In 1961, Blackburn broke his back while at work and has had recurring back problems since then. In 1972, Blackburn quit working, primarily because of his back pain and his difficulty breathing. He applied for benefits under both the Black Lung Benefits Act and the Social Security Act, and black lung benefits were approved but his Social Security disability claim was denied.
 
 
 7
 Although Blackburn had many physical disabilities during the relevant time period,[1] the alleged error in the ALJ's determination is primarily that the ALJ failed to find disability based on Blackburn's mental and psychological impairments. Thus, the evidence reviewed here primarily relates to Blackburn's mental condition. The ALJ's determination required a certain amount of extrapolation (or speculation) because little direct evidence existed regarding Blackburn's condition in 1977. The bulk of the evidence comes from two general time periods: pre-1977 and 1985-87. For the year 1977, the only evidence came from Blackburn, his wife, and his doctor, Dr. Wright. Dr. Wright was the only doctor to see Blackburn in 1977, and because his records were destroyed in a fire, he had to testify from memory. We briefly summarize the evidence from these time periods.
 
 1. Evidence from 1975-1976
 
 8
 Dr. Johnson, a clinical psychologist, evaluated Blackburn in 1975 and found borderline mental retardation (IQ scores in the 70s). In his report, he wrote, "[Blackburn] complained of anxiety although there were no overt signs of this condition" and Blackburn "exhibited a low tolerance for frustration and gave up easily when the task became difficult." He concluded:
 
 
 9
 This person has a history of successful work experience and for that reason he would be able to perform simple repetitive tasks. However, his motivation and energy levels are low, and it is doubtful that he would seek work or vocational training. He is capable of handling his own financial matters.
 
 
 10
 In 1975, Dr. Corcella, a psychiatrist, diagnosed Blackburn as having Anxiety Neurosis with a secondary diagnosis of Borderline Mental Retardation due to psychosocial deprivation. Corcella wrote:
 
 
 11
 ... Interpersonal attitudes appeared poor. Speech and communication were unimpaired. Affect was somewhat flat. Patient was oriented to time, place and person. Memory for recent and remote events appeared to be fair. Intellectual functioning was judged to be below the normal range of intelligence. Judgement and insight into his problem appeared poor.
 
 
 12
 ... Treatment plan consists of attempting to motivate the patient for outpatient psychotherapy.
 
 
 13
 Prognosis for this individual's improvement and better functioning is fair should he submit to outpatient therapy. However, without psychiatric intervention, it is doubtful that the patient will improve and will, most probably, see an increase in the severity of his symptoms. In his present state, the patient is capable of managing any finances for which he may be eligible.
 
 
 14
 Dr. Evans, a specialist in internal medicine, saw Blackburn in 1975 and as part of his medical report noted, "It was necessary to resort to first leading and then direct questions to elicit statements [about his health]." Evans made no comments about Blackburn's mental health.
 
 
 15
 In 1976, Dr. Nichols confirmed Blackburn's physical ailments and found that Blackburn had "a large element of anxiety." He did not comment further on Blackburn's psychological state.
 
 
 16
 2. Direct evidence of Blackburn's condition in 1977
 
 
 17
 As noted above, Dr. Wright was the only doctor to see Blackburn during 1977. Wright began seeing Blackburn in 1976 and saw him many times from 1976 to 1982, and then again in 1987. Because Wright's records were destroyed in a fire in 1980, he testified from memory about Blackburn's condition in 1977.
 
 
 18
 Wright recalled that Blackburn's serious physical disabilities alone limited him to light or sedentary work. As for Blackburn's mental health, Wright testified that Blackburn "was having considerable emotional difficulties, and at that time was being placed on nerve medication also." The following is taken from his deposition.
 
 
 19
 Q. Doctor, relative to the nervous condition which you have described, did you make a specific diagnosis in that regard? I am referring to 1977 at this time.
 
 
 20
 A. I do remember diagnosing him as suffering from chronic anxiety depressive neurosis.
 
 
 21
 Q. Doctor, with pneumoconiosis I guess we can look at x-ray and see nodulation and that confirms a diagnosis with the appropriate history and complaints. What objective evidence, if you can recall, did Mr. Blackburn exhibit relative to this particular diagnosis?
 
 
 22
 A. He at that time from office visit to office visit was experiencing and demonstrating wide mood changes. He would vary from one office visit to being quite [sic] and not responsive to questioning to episodes of elation on some office visits. This episode of depression and elation I specifically remember, because it was affecting his entire family at the time. I might put it in lay terms. His wife there for about two years liked to have drove me crazy wanting something done.
 
 
 23
 Q. This would have been specifically in the year 1977?
 
 
 24
 A. That is correct.
 
 
 25
 Q. Doctor, if you could, explain for the record why you say his wife liked to have drove you crazy?
 
 
 26
 A. Like I said, it was affecting the entire family. Not only his wife, but his children too, and she would frequently call the office and visit the office. I would get calls at ten and eleven o'clock at night at home wanting me to do something for him. I would try to explain to her that, you know, a lot of these symptoms required time to resolve themselves and sometimes could only be controlled with medication, and can't be cured, but she didn't seem to understand this.
 
 
 27
 Wright believed that Blackburn's emotional condition and total inability to relate to others standing alone made Blackburn unable to do any type of work. Wright was asked, "If [Blackburn] didn't have to relate to other people and only occasionally had to lift ten (10) pounds, he could have done that type of work?" Wright answered, "His nervous condition at the time--he was very emotionally unstable, and I really think at that point--I doubt if he could have worked at anything just due to his nerves alone."
 
 
 28
 Mrs. Blackburn also testified about her husband's condition. She described how he had steadily lost his mental abilities, and how she would have to explain things to him several times before he would understand. He rarely left the house, little things like noise or children playing made him upset and he did not know why, and whenever he felt pressured to make a decision, he got nervous and visibly shaky.
 
 3. Evidence and opinions from 1985-87
 
 29
 In 1987, Dr. Wright noted that Blackburn's condition was unchanged from 1977: he had the same mental impairments as he did in 1977, and his medical condition was unchanged or worse.
 
 
 30
 Psychiatric Review Technique Forms were completed by non-examining state agency psychiatrists in 1985 and 1986. The report concluded that in 1977 Blackburn had borderline IQ and had "moderate" limitations[2] in his ability to:
 
 
 31
 1. perform activities within a schedule;
 
 
 32
 2. maintain regular attendance;
 
 
 33
 3. be punctual within customary tolerances;
 
 
 34
 4. complete a normal workday and workweek without interruptions from psychologically based symptoms;
 
 
 35
 5. perform at a consistent pace without an unreasonable number and length of rest periods;
 
 
 36
 6. respond appropriately to changes in the work setting; and
 
 
 37
 7. accept instructions and respond appropriately to criticism from supervisors.
 
 
 38
 Dr. Granacher, a noted forensic psychiatrist, completed a five and one-half hour examination of Blackburn in 1987. Blackburn's full scale IQ score was 58. Granacher wrote in his report,
 
 
 39
 This man has obvious mental retardation. It is clear that he has not functioned well for at least fifteen years or more. The most likely cause for his difficulty is a closed head injury occurring at the age of 12 or 13 and currently progressive cerebral deterioration resulting in impaired mental functioning.
 
 
 40
 This man is very impaired and in all probability cannot function in any competitive work environment. He is likely to be impaired for more than one year.
 
 
 41
 In his deposition, Granacher was asked, "Doctor, are there any types of jobs in your opinion out there for an individual with a first or second grade education level?" Granacher answered, "Some seasonal work--maybe chopping corn or picking strawberries; but in terms of anything in the competitive work environment, including being a janitor, [Blackburn] wouldn't be able to do." It was Granacher's opinion that there were no jobs that Blackburn could do:
 
 
 42
 Anything where he would have to sustain employment over time, he couldn't do. ... Something as simple as sweeping the floor or picking up things--collecting garbage, even--this man couldn't do it.... The main problem [in the work place would be] you'd have to stand over him constantly. Just to get him tested was very difficult for us. He was here over five hours, and he couldn't sustain that. He just couldn't do it; and we weren't having him do anything physical.
 
 
 43
 Granacher also concluded, based on his testing information and a review of other doctors' reports, that Blackburn's condition was totally disabling in 1977.
 
 II
 
 44
 Blackburn raises two primary issues on appeal. First, he argues that the hypothetical question posed to the vocational expert was improper because it invaded the province of the expert by assuming certain facts about Blackburn's abilities. Second, he argues that the denial of benefits was not supported by substantial evidence.
 
 A. Vocational Expert's Testimony
 
 45
 Once the ALJ determined that Blackburn could not perform his past relevant work, the burden shifted to the Secretary to show that Blackburn possessed the capacity to perform other substantial gainful activity. See Kirk v. Secretary of Health and Human Servs., 667 F.2d 524, 529 (6th Cir.1981), cert. denied, 461 U.S. 957 (1983). To meet this burden, there must be a finding supported by substantial evidence that Blackburn has the vocational qualifications to perform specific jobs. O'Banner v. Secretary of Health, Educ. & Welfare, 587 F.2d 321, 323 (6th Cir.1978). Substantial evidence may be produced through reliance on the testimony of a vocational expert ("VE") in response to a hypothetical question, but only "if the question accurately portrays the [claimant's] physical and mental impairments." Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir.1984); see Varley v. Secretary of Health and Human Servs., 820 F.2d 777, 779 (6th Cir.1987).
 
 
 46
 The ALJ, in asking the determinative hypothetical question, may ask the VE to assume particular facts if they are supported by substantial evidence. Varley, 820 F.2d at 780. It is the function of the VE to then testify as to what jobs the claimant could perform with the impairments listed by the ALJ.
 
 
 47
 At the 1990 hearing, the ALJ asked the VE to assume that (1) Blackburn had certain impairments (which the ALJ noted), and (2) that Blackburn could do "simple repetitive tasks." The VE then identified a number of jobs Blackburn could do. However, in discussing the types of jobs the claimant could do, the VE added that the availability of the jobs to the claimant was "largely predicated on the assumption, as [the ALJ] indicated in [his] hypothetical, that the individual was capable of performing simple repetitive tasks." On follow-up questions by the ALJ, the VE testified,
 
 
 48
 If I were to accept all of the components of the hypothetical without [the "simple repetitive tasks" assumption], it would be my opinion that principally, because of the moderate limitation not severe in any area but the moderate limitation in such a broad range of basis [sic] work-related behaviors, the combined accumulative effect of those limitations would render an individual incapable of performing on a sustained and competitive basis in any job that I know of regardless of exertion level.
 
 
 49
 Blackburn argues that there is obvious error in the question and the resulting answer. His argument is that by telling the VE that Blackburn could perform simple jobs in the workplace, the ALJ reduced the testimony of the VE to affirming that there are simple jobs in the national economy. This argument finds some support in the transcript. In fact, right after Blackburn's attorney finished questioning the VE, the ALJ's own comments indicate that he believed he had made a mistake. He said,
 
 
 50
 [W]hat I may have done by including that last clause in my hypothetical is to cut you [the VE] off at the knees. In other words, force you to accept--that it constitutes a conclusory matter with respect to the [other disabilities mentioned]. ... [W]hen I throw in the additional clause ..., then I have thrown in the conclusion [and] I leave you nothing to answer.... I think then what I've done is to--to--with my final clause there is probably invalid because ... we've got to leave you free to draw your own conclusion. I can't supply you with one.
 
 
 51
 The ALJ attempted to correct the situation by asking the hypothetical question without the "repetitive tasks" clause, but then the VE answered that there were no jobs that Blackburn could perform.
 
 
 52
 While we admit that at first glance it appears that the ALJ committed error, we conclude that the first hypothetical question (which included the "repetitive tasks" assumption) and the answer given to it were sufficient to carry the Secretary's burden of proof. When studied, the record shows that the ALJ determined that despite Blackburn's disabilities, he could perform simple, repetitive tasks. The VE apparently disagreed with the ALJ's finding; however, it was the duty of the ALJ to determine the factual assumptions for the question, and the disagreement of the VE is of no import. And since the VE testified that jobs were available for an individual who could perform simple repetitive tasks even with the noted impairments, the VE's testimony was sufficient to carry the Secretary's burden.
 
 B. Sufficiency of the Evidence
 
 53
 Title 42 U.S.C. § 405(g) provides that the Secretary's factual findings are conclusive if supported by substantial evidence. In determining this question, the court is to examine the evidence in the record "taken as a whole," Allen v. Califano, 613 F.2d 139, 145 (6th Cir.1980), and " 'must take into account whatever in the record fairly detracts from its weight,' " Beavers v. Secretary of Health, Educ. & Welfare, 577 F.2d 383, 387 (6th Cir.1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).
 
 
 54
 Blackburn criticizes the ALJ's conclusions as to each of the witnesses' testimony. We address each in turn.
 
 1. Testimony of the claimant and his wife
 
 55
 The ALJ first considered the testimony of both Blackburn and Blackburn's wife. The ALJ discounted the testimony of each of them for credibility reasons. Of Mrs. Blackburn's testimony, the ALJ wrote,
 
 
 56
 I also have much difficulty with the assessment of the claimant's wife regarding her spouse's functioning. She is clearly not an uninterested party as she has a significant financial interest in the matter.
 
 
 57
 The ALJ also found Blackburn's own testimony exaggerated and incredible. As to Blackburn's self-assessment of his functional restrictions, the ALJ wrote,
 
 
 58
 His 1987 testimony regarding his condition in 1977 is naturally suspect due to the long period of time involved and the difficulty of recalling the specific limitations of a condition over that length of time. When I also take note of the marked disparity in the [physical] appearance of the claimant from January 1987, at the time of the hearing [the ALJ thought he looked fine], and June 1987, when he was examined by Dr. Granacher [Granacher described a very poor appearance], I must again wonder as to the claimant's motivation.
 
 
 59
 While we have some reservations about the ALJ's assessments here, credibility is a matter for the ALJ. "Since the ALJ had the opportunity to observe the demeanor of [the witness], his conclusions with respect to credibility 'should not be discarded lightly.' " Houston v. Secretary of Health and Human Servs., 736 F.2d 365, 367 (6th Cir.1984) (quoting Beavers v. Secretary of Health, Educ. & Welfare, 577 F.2d 383, 387 (6th Cir.1978)). We must defer to the ALJ's determination on this point.
 
 
 60
 2. The opinions of Drs. Wright and Granacher
 
 
 61
 The ALJ rejected the testimony of Drs. Wright and Granacher for several reasons. Dr. Wright's opinion was criticized because Wright testified from memory about Blackburn's condition in 1977 and because Wright's later evaluation came ten years after the relevant time period. Dr. Granacher's opinion was discarded because Granacher had no first hand knowledge of Blackburn's condition in 1977. Both doctors' opinions were criticized for lacking "objective signs and laboratory findings."
 
 
 62
 While we probably would not have weighed or analyzed the testimony of Drs. Wright and Granacher as critically as the ALJ did, we do not conduct a de novo review, and we will not overturn these factual determinations because there is some basis in the record for the ALJ's findings.
 
 3. Testimony of Dr. Johnson
 
 63
 The ALJ gave substantial weight to the opinion of Dr. Johnson, and Blackburn objects to this finding for three reasons. First, the ALJ's reliance on a particular sentence ("[Blackburn] would be able to perform simple repetitive tasks") from one psychiatrist's report is weak because the meaning of the sentence is uncertain. Blackburn asserts that Johnson did not mean that he could perform repetitive tasks consistently and in a work environment, but only that he could do repetitive tasks on an isolated basis. Second, Johnson's opinion, even if taken to mean Blackburn can do repetitive tasks on a sustained basis, is based only on his mental capacity. Dr. Johnson only saw Blackburn for psychological reasons, not physical or medical reasons, so the crucial requirement that the impairments be taken cumulatively, is not present in Johnson's conclusion. Third, the ALJ rejected the testimony of the treating physician (Dr. Wright) and based his decision on the opinion of Johnson, a doctor who saw Blackburn only once. This was alleged to be error because the opinion of the treating physician is entitled to greater weight and is generally accorded substantial deference. See Harris v. Heckler, 756 F.2d 431, 435 (6th Cir.1985); Branham v. Gardner, 383 F.2d 614, 634 (6th Cir.1967).
 
 
 64
 We again note that were we conducting a de novo review of the evidence here, we might reach a different conclusion from that of the ALJ. However, The ALJ's determinations are not without support. Dr. Johnson's conclusion was based on Blackburn's past work history and the ALJ could have reasonably interpreted this to be a finding that Blackburn's mental impairments would not prohibit him from performing certain types of work. Dr. Johnson's failure to consider Blackburn's physical impairments also is not fatal to his opinion because it has not been shown that Blackburn's physical impairments so complicate Blackburn's situation as to render him incapable of doing some forms of sedentary work. The ALJ also articulated reasons for rejecting the testimony of Dr. Wright, the treating physician, so it was permissible for the ALJ to give Dr. Johnson's opinion greater weight.
 
 4. Other Evidence
 
 65
 The other evidence produced was equivocal on the issue of total disability. Blackburn argues that this supports his argument that he was disabled, but this evidence supports the opposite conclusion equally well. We cannot say that the ALJ should have found disability based on this evidence.
 
 III
 
 66
 Cases arise in which we, as a court of appeals, have serious doubts about whether we would have reached the same conclusion had we been the initial triers of fact in the matter, and this is one of those cases. However, we are bound to give substantial deference to the ALJ's findings, and because there is substantial evidence for the ALJ's determination, we AFFIRM.
 
 
 
 *
 The Honorable John M. Manos, United States District Judge for the Northern District of Ohio, sitting by designation
 
 
 [1]
 His physical disabilities included:
 
 
 [1]
 pneumoconiosis (and resulting pulmonary impairment)
 
 
 [2]
 emphysema
 
 
 [3]
 difficulty walking due to deformity of the right tibia and fibula
 
 
 [4]
 atrophy in the right calf due to two compression fractures
 
 
 [5]
 degenerative changes in the lumbar spine
 
 
 [6]
 chronic back pain
 
 
 [7]
 chest pains
 
 
 [8]
 ulcers
 
 
 [9]
 chronic prostatitis
 
 
 [10]
 renal stones
 
 
 [11]
 arthritis
 
 
 [2]
 This standard evaluation form has five levels of limitation: none, slight, moderate, marked/frequent, and extreme